636 P.2d 1269

NORTHEAST PHOENIX HOMEOWNERS' ASSOCIATION, a non-profit corporation; Everett Smith, et ux.; D. R. Greenwood, et ux.; Michael Moulds, et ux.; Everett Worfolk, et ux.; Plaintiffs-Appellants,

v.

SCOTTSDALE MUNICIPAL AIRPORT; the City of Scottsdale; and William C. Jenkins, Richard Campana, Herb Drinkwater, Billie Gentry, Dr. Heinz Hink, Jeff Schubert and Charles Smith, as the City Council of the City of Scottsdale, Defendants-Appellees.

No. 1 CA–CIV 4686.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 13, 1981.

Francis G. Fleming, P. C. by Francis G. Fleming, New York City, for plaintiffs-appellants.

Richard Filler, Scottsdale City Atty. by Donald O. Loeb, Asst. City Atty., Scottsdale, for defendants-appellees.

## OPINION

HAIRE, Presiding Judge.

This multiple party litigation arose out of a conflict between certain residents of Northeast Phoenix and the City of Scottsdale as the owner and operator of the Scottsdale Municipal Airport. The Northeast Phoenix Homeowners' Association is a nonprofit corporation, suing on its own behalf and that of its members. The individual plaintiffs are landowners whose homes are located under the flight path of airplanes using the airport and within 1,000 yards of the airport. The defendants include the Scottsdale Municipal Airport,[1] the City of Scottsdale, as the owner and operator of the Scottsdale Municipal Airport, and the Scottsdale City Council members in their representative capacities.

## I

## PROCEEDINGS IN THE TRIAL COURT

The complaint alleges various injuries to the plaintiffs and their homes resulting

---

1. The record does not reveal the basis upon which "Scottsdale Municipal Airport" has been sued as an entity separate and apart from the City of Scottsdale.

from the operation of the airport. The gravamen of the complaint is that low-flying aircraft have created and will continue to create excessive and unreasonable noise, dust, vibration and intrusive light, such that plaintiffs are and will continue to be exposed to physical danger, interruption of sleep and conversation, physical discomfort and general disruption of the peaceable enjoyment of their lands. Furthermore, the complaint alleges that the defendants have resolved to extend the runway of the airport so as to increase the number and size of aircraft using the flight path, thereby increasing the interference with the use of plaintiffs' lands and appurtenances without reasonable justification.

The complaint includes six counts. Counts I, II and III seek injunctive relief on theories of trespass, nuisance, and violation of statutes regarding flight operations. Count IV alleges that to extend the runway requires an amendment to the City of Scottsdale's "master plan",[2] and seeks a declaration that the city's amendment of the plan was invalid. Count V is an alternative claim for inverse eminent domain damages in the event the court finds that injunctive relief is unavailable. Count VI is also an alternative claim, alleging that if it is determined that plaintiffs are not entitled to relief under Arizona statutes or common law pursuant to the claims alleged in their first five counts, then plaintiffs have been denied due process pursuant to the fourteenth amendment and the provisions of the Civil Rights Act, 42 U.S.C. § 1983.

The judgment which is the subject of this appeal resulted from a motion to dismiss filed by defendants. The motion was granted as to the claims for injunctive relief set forth in Counts I, II and III.[3] Count IV, in which plaintiffs requested declaratory relief concerning defendants' alleged failure to properly amend its master plan in connection with its decision to lengthen the airport's runway was also dismissed, upon the basis that the challenged amendments were not required as a prerequisite to the proposed runway extension. The judgment did not dispose of Counts V and VI, and there remains pending in the trial court plaintiffs' money damage claims in nuisance, trespass and inverse eminent domain, as well as their claims relating to water diversion onto real property owned by some of the plaintiffs.[4]

The basis for the dismissal of plaintiffs' claims for injunctive relief under state law was the trial court's conclusion that the requested regulation of defendants' airport operations through the use of the court's injunctive powers had been preempted by pervasive federal law in the area of airport operations and airport noise regulations. We therefore will initially consider the preemption issue before proceeding to other issues urged on appeal.

In their first three counts, plaintiffs sought the following injunctive relief:

2. This is apparently a reference to a general statement of land development plans and policies adopted by the City of Scottsdale pursuant to A.R.S. § 9–461, *et seq.*

3. An exception contained in the judgment leaves Counts I and II viable as to claims asserted by plaintiffs relating to alleged "surface water and/or water course diversion" by defendants.

4. In view of the fact that the trial court's judgment did not dispose of all of plaintiffs' claims, we have *sua sponte* considered the question of this court's appellate jurisdiction. *See Rueda v. Galvez,* 94 Ariz. 131, 382 P.2d 239 (1963). Insofar as concerns the denial of injunctive relief inherent in the trial court's dismissal of Counts I, II and III, we have jurisdiction pursu-

ant to A.R.S. § 12–2101 F(2). With respect to the dismissal of Count IV, since fewer than all the claims asserted by plaintiffs have been adjudicated, our jurisdiction is dependent upon a determination of finality by the trial judge concerning that count. Rule 54(b), Rules of Civil Procedure, 16 A.R.S. While a literal reading of the language of the judgment limits the trial court's Rule 54(b) language to Counts I, II and III, neither party urges that the judgment be so restrictively interpreted, and from the overall context it appears to have been the intention of the trial judge to accord finality for appeal purposes to the entire judgment. We therefore have concluded that we have appellate jurisdiction over all matters raised on appeal.

1) To restrain defendants from extending the runway;

2) To impose a reasonable curfew upon the hours of flight operations;

3) To prohibit non-standard (i.e., right-hand) turns; and

4) To require all aircraft to utilize the full runway and threshold available in their operations so as to cause aircraft to over-fly plaintiffs' lands and appurtenances only when necessary and at as high an altitude as possible.

## II

### FEDERAL PREEMPTION OF AVIATION REGULATIONS

The defendants contended that the federal statutory and regulatory scheme so pervasively regulated airport operations and aircraft noise that the power of state courts to grant injunctive relief in the area had been totally preempted. It was their position that any relief in the form of an injunction would "fly in the face of the federal system of dual control of airport noise problems by the FAA and the local airport proprietor."

The United States Supreme Court addressed the issue of federal preemption of aviation regulation in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). The City of Burbank had enacted a noise abatement ordinance which made it unlawful for jet aircraft to take off from Hollywood-Burbank Airport between 11:00 p.m. and 7:00 a.m. The court held that this type of local regulation of aircraft operations had been preempted because of "the pervasive nature of the federal regulation of aircraft noise." The court then explained:

"It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption. As Mr. Justice Jackson stated, concurring in *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283:

'Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.' " 411 U.S. at 633–34, 93 S.Ct. at 1859–60, 36 L.Ed.2d at 554.

The *Burbank* court's preemption analysis was based upon the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.* (1976 and Supp. 1981), as amended by the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.* (1976 and Supp. 1981).

Central to the court's concern was that to restrict the hours during which the airport was available for outgoing flights had a direct impact on Federal Aviation Administration (FAA) control over flight operations. That agency was charged with responsibility for balancing the potentially conflicting goals of noise abatement, safety and efficiency in the area of actual flight operations. The court acknowledged the agency's expertise in regulating take-off and landing procedures and runway preferences. To permit local curfew and other local regulation of flight operations would create the possibility that inconsistent regulations in various localities would impede interstate commerce or significantly affect the flexibility of the FAA in controlling air traffic flow and safety.

The Supreme Court stated:

"The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground. 49 U.S.C. § 1348(c). Any regulations adopted by the Administrator to control noise pollution must be consistent with the 'highest degree of safety.' 49 U.S.C. § 1431(d)(3). The *interdependence of these factors requires a uniform and exclusive system of federal regulation* if the

congressional objectives underlying the Federal Aviation Act are to be fulfilled.

"If we were to uphold the Burbank ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of the FAA in controlling air traffic flow. The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded. In 1960 FAA rejected a proposed restriction on jet operations at the Los Angeles airport between 10 p.m. and 7 a.m. because such restrictions could 'create critically serious problems to all air transportation patterns.' 25 Fed.Reg. 1764–1765.

\* \* \* \* \* \*

This decision, announced in 1960, remains peculiarly within the competence of FAA, supplemented now by the input of EPA. We are not at liberty to diffuse the powers given by Congress to FAA and EPA by letting the States or municipalities in on the planning. If that change is to be made, Congress alone must do it." 411 U.S. at 638–40, 93 S.Ct. at 1862–63, 36 L.Ed.2d at 556–57. (Footnote omitted; emphasis added).

In our opinion the *Burbank* court's analysis applies with equal force to the injunctive relief sought in the plaintiffs' complaint. In addition to the plaintiffs' request for a curfew, which clearly is not permissible, the complaint requested that the court prohibit "non-standard turns" and that it require full utilization of the runway.

Attempts of this nature to abate noise by regulating flight operations have been considered and prohibited by federal courts on grounds of preemption. In *Luedtke v. County of Milwaukee*, 521 F.2d 387 (7th Cir.

1975), the Seventh Circuit determined that establishing flight patterns, air traffic corridors, noise control standards or rules governing emissions had been preempted. Similarly, other attempts to regulate the noise of over-flying jets have been held to be preempted. *See Allegheny Airlines v. Village of Cedarhurst*, 238 F.2d 812 (2d Cir. 1956); *American Airlines, Inc. v. Town of Hempstead*, 398 F.2d 369 (2d Cir. 1968), *cert. den.* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).

■ The FAA is charged with regulating the operation of flights and with balancing the interests of safety, efficiency and noise abatement in constructing its regulations. For the state through legislative or court action to impose curfews, prohibit certain types of turns or to dictate runway utilization infringes upon the FAA's charge. We therefore hold that the trial court had no power to regulate through its injunctive powers the operation of flights, the methods of landing or takeoff of aircraft, or any other aspect of actual aircraft operation technique or scheduling.[5]

Plaintiffs attempt to exclude the requested relief from the preemptive effect of the federal statutory scheme by directing our attention to footnote 14 in *Burbank*. In that footnote the Supreme Court recognized that, while federal law had preempted the field insofar as state and local governmental regulatory powers are concerned, there still remained an as yet undetermined residual power in the airport proprietors, whether they be private or public entities, to voluntarily adopt noise-related regulations regarding the operation of their airports and the aircraft using their airports.

Several courts have recognized that, in part, the rationale for permitting airport proprietors to enforce reasonable regula-

---

5. This question of preemption of flight scheduling was considered in *Williams v. Superior Court in and for County of Pima*, 108 Ariz. 154, 494 P.2d 26 (1972). There the court determined that federal regulation had not preempted the field. However, *Williams* was decided before the United States Supreme Court decided *City of Burbank v. Lockheed Air Terminal, Inc., supra.* Both parties concede that, with respect to its preemption holding, *Williams* can no longer stand.

tions to minimize noise is based upon *Griggs v. County of Allegheny,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). *See, e.g., Santa Monica Airport Association v. City of Santa Monica,* 647 F.2d 3 (9th Cir. 1981); *National Aviation v. City of Hayward,* 418 F.Supp. 417 (N.D.Cal.1976); *British Airways Board v. Port Authority of New York,* 558 F.2d 75 (2d Cir. 1977) (Concorde I). In *Griggs* the United States Supreme Court held that an airport owner can be a "taker" under the fourteenth amendment and is liable in damages for property takings due to interference with property use resulting from aircraft operations and flying aircraft. The airport owner has thus been left with some residual control to restrict the use of the airport in order that he might limit his liability. Airport owners have also been held responsible to residents living in close proximity to airports for damages for personal injury resulting from aircraft noise. *See Greater Westchester Homeowners Association v. City of Los Angeles,* 26 Cal.3d 86, 160 Cal.Rptr. 733, 603 P.2d 1329 (1979), *cert. den.* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); *Owen v. City of Atlanta,* 157 Ga.App. 354, 277 S.E.2d 338 (1981).

Although their argument is not entirely clear, plaintiffs suggest that judicially imposed regulation of municipally owned airports somehow falls within the "proprietary regulation" exemption from federal preemption. To evaluate this we must first give further consideration to footnote 14 of *Burbank* and the rationale for the "proprietors' exception" to preemption.

In *Burbank* the proprietor was Lockheed Air Terminal, a private entity. The challenged curfew ordinance was imposed by the City of Burbank in its exercise of its police power. The question of what freedom the airport proprietor itself might have to impose curfews relative to its own airport was not before the court. The City of Burbank was clearly not a proprietor, exercising its powers as such. It was acting as a political subdivision of the state, exercising the state's police power. In footnote 14,

the court only recognized that cities might sometimes be acting as proprietors, saving for future consideration the application of the preemption doctrine to ordinances or regulations enacted by a municipality in its capacity as an airport proprietor.

That the federal regulatory scheme was not intended to prohibit reasonable and nondiscriminatory regulation by airport proprietors has been developed in cases decided subsequent to *Burbank. See British Airways Board v. Port Authority of New York,* 564 F.2d 1002 (2d Cir. 1977) (Concorde II); *British Airways Board v. Port Authority of New York,* 558 F.2d 75 (2d Cir. 1977) (Concorde I); *National Aviation v. City of Hayward,* 418 F.Supp. 417 (N.D.Cal.1976). In *Concorde I, supra,* the Second Circuit held that the Port Authority, as the proprietor of J.F.K. Airport, could impose a reasonable, nondiscriminatory ban on supersonic aircraft. However, later, in *Concorde II,* the court enjoined the enforcement of the ban, determining that the Port Authority had delayed for too long the development of reasonable noise regulations. In *Concorde II,* the Second Circuit described the role Congress had reserved for airport proprietors in the management of aviation as "extremely limited". 564 F.2d at 1010. It stated:

"Common sense, of course, required that exclusive control of airspace allocation be concentrated at the national level, and communities were therefore preempted from attempting to regulate planes in flight. See *Allegheny Airlines v. Village of Cedarhurst,* 238 F.2d 812 (2d Cir. 1956); *American Airlines v. Town of Hempstead,* 398 F.2d 369 (2d Cir.), *cert. denied* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). *The task of protecting the local population from airport noise, however, has fallen to the agency, usually of local government, that owns and operates the airfield. Air Transport Assn. v. Crotti,* 389 F.Supp. 58 (N.D.Cal.1975) (three-judge court); *National Aviation v. City of Hayward,* 418 F.Supp. 417 (N.D.Cal. 1976).

\*　　\*　　\*　　\*　　\*　　\*

The maintenance of a fair and efficient system of air commerce, of course, mandates that each airport operator be circumscribed to the issuance of reasonable, nonarbitrary and nondiscriminatory rules defining the permissible level of noise which can be created by aircraft using the airport. *Concorde I, supra* at 84. We must carefully scrutinize all exercises of local power under this rubric to insure that impermissible parochial considerations do not unconstitutionally burden interstate commerce or inhibit the accomplishment of legitimate national goals." 564 F.2d at 1010–11. (Emphasis added; some citations omitted).

The plaintiffs' complaint in this case, however, requests the state *judiciary* to use its injunctive power to prescribe regulations and rules relative to airport operations. Such rules mandated by a court through its injunctive powers would in no sense emanate from the airport proprietor, the City of Scottsdale. The *Burbank* preemption holding applies not only to state and local legislation in this area, but also to judicially made rules and regulations governing airport and airline operations. *Luedtke v. County of Milwaukee*, 521 F.2d 387 (7th Cir. 1975).

Plaintiffs contend that *Air Transport Association of America v. Crotti*, 389 F.Supp. 58 (N.D.Cal.1975) (statutory three-judge panel), supports their position. There, a three-judge federal panel concluded that certain elements of California's airport noise regulation scheme were not invalid per se. California had enacted a statutory scheme whereby any airport which did not meet certain noise level standards ("CNEL standards") was subject to fines and penalties unless it secured a variance. The statutes authorized the state to monitor noise levels in the areas surrounding airports to determine if such land was subjected to excessive noise levels. Unless the airport had obtained a variance, the statute subjected the airport to penalties and possible prohibitions if its operations subjected any incompatible (i.e., residential) land use in the area to excessive noise.

While the *Crotti* court refused to hold that this "CNEL" scheme was preempted, its holding in that regard was very tentative. The court noted that no action had yet been taken by the state to force compliance with the statutory noise levels and that the regulation was basically directed at controlling land use compatibility. Thus, the court did not have before it any specific state-imposed regulation or requirement designed to force compliance with the "CNEL" noise standards, and it was not in a position to determine whether any specific mode of implementing the statute had been preempted. In that regard we note that when the state of California, acting through one of its regulatory agencies, subsequently attempted to implement the same "CNEL" regulations and actively enforce them against an airport proprietor, the Ninth Circuit Court of Appeals rejected the attempt, holding that the regulations violated *Burbank's* preemption holding. *San Diego Unified Port District v. Gianturco*, 651 F.2d 1306 (9th Cir. 1981).

In arriving at this conclusion the Ninth Circuit also rejected any implication which might otherwise be gained from *Crotti* from the premise that since a municipality is a creation of the state, and has discretion to voluntarily regulate an airport, which it owns, the state as the creator of the municipality might use its police powers to coerce the municipality to exercise its discretion in a specific manner for noise abatement purposes. Similarly, we reject plaintiffs' suggestion that since the defendant City of Scottsdale is the proprietor of the airport and admittedly has the discretion to voluntarily take actions affecting the operation of the airport which would lessen the impact of noise upon plaintiffs' lands, such action may be mandated by the state through injunctive relief by Arizona courts applying Arizona common law principles.

In summary, we do not find persuasive any argument, based upon *Crotti*, that the

state court's injunctive power is exempt from preemption based upon the "proprietary" exception. The *Burbank* preemption holding applies not only to state and local legislative bodies, but also to attempts to have the courts fashion rules and regulations which would be invalid under *Burbank. Luedtke v. County of Milwaukee, supra.*

■ Plaintiffs' final argument in support of their contention that the trial court erred in denying injunctive relief is principally directed to the trial court's refusal to enjoin the proposed extension of the airport's runway. Plaintiffs correctly point out that some courts have recognized that the *Burbank* preemption holding does not necessarily negate the authority of state and local governmental units to control the effects of aircraft noise through the exercise of land use planning and zoning powers, thereby insuring land use compatibility. *See San Diego Unified Port District v. Gianturco, supra; Wright v. County of Winnebago,* 73 Ill.App.3d 337, 29 Ill.Dec. 347, 391 N.E.2d 772 (1979); *Air Transport Association of America v. Crotti, supra.* Relying upon this exception, plaintiffs characterize their claims as simply involving airport "site selection" and urge that the court can resolve the controversy through the application of state law governing zoning and land use planning.

Initially, we find plaintiffs' characterization of the thrust of their complaint misleading. It is uncontradicted that the Scottsdale Municipal Airport and the runway in question have been in existence at the same site long prior to the filing of plaintiffs' complaint in this action. There is no allegation that the site or location of the airport is to be moved or changed in any way by the proposed runway extension. With the possible exception of plaintiffs' Count IV which will be subsequently discussed in this opinion, plaintiffs' complaint does not involve a request for relief based upon a state or local planning and zoning law; rather, it is simply a request that the

court prohibit the extension of an existing runway at an existing airport so as to relieve plaintiffs from a contemplated increase in noise levels and other disturbances emanating from aircraft utilizing the airport facilities. Likewise, there has been no allegation or showing that by the initial location of its airport, the City of Scottsdale has *ab initio* violated any zoning or land use planning laws of the state or any local legislative body.

Plaintiffs' contentions concerning the proposed runway extension are substantially analogous to those presented to the Illinois court in *Village of Bensenville v. City of Chicago,* 16 Ill.App.3d 733, 306 N.E.2d 562 (1973). In that case, the plaintiffs sought to enjoin the extension of a runway and expansion of facilities at O'Hare Airport. In holding that injunctive relief was not available, the court appropriately concluded that the relief sought impinged upon the *Burbank* preemption holding, stating:

"[D]espite language relating to the expansion of runways and supporting facilities, the real thrust of the plaintiffs' complaint is to prohibit ... aircraft from producing noise or emitting fumes (while in flight over their territorial boundaries) in excess of certain limits to be fixed by the Illinois Chancery Court." 16 Ill. App.3d at 735, 306 N.E.2d at 564.

Similarly, the real thrust of plaintiffs' complaint in this action is a request that the court take action to limit noise levels emanating from aircraft flying over their lands, and plaintiffs' attempt to mask this request in "site selection" language must be rejected.

As a final observation concerning plaintiffs' contention that the trial court could have enjoined the runway extension under the state's land use planning and zoning powers, plaintiffs have cited no authority which would grant this power to the courts as opposed to state and local legislative bodies. In fact, while the state legislature has enacted legislation enabling the state's political subdivisions to adopt airport zoning ordinances assuring the development of compatible land uses in areas adjacent to airports, that legislation specifically prohibits political subdivisions from adopting any

regulation which would restrict or limit the length of an airstrip or runway.[6] Thus, even if we were to disregard the preemption issue, we find a strong statement of legislative policy against the granting of the runway extension relief requested by plaintiffs.

Plaintiffs suggest that even if some of the injunctive relief sought by plaintiffs would have been improper for the superior court to award because of the possibility of conflicting federal regulations, the claims should not have been dismissed, but rather the trial court should have retained jurisdiction and attempted to fashion relief which did not conflict with the federal regulatory scheme. *See Williams v. Superior Court in and for County of Pima*, 108 Ariz. 154, 494 P.2d 26 (1972). Plaintiffs do not attempt to enlighten this court as to what this possible accommodation might be, and we can discern no possible accommodation separate and apart from plaintiffs' remedies in damages, which remain viable in the trial court.

We hold that plaintiffs' claims for injunctive relief were properly dismissed by the trial court. In arriving at this conclusion we realize that there is some inconsistency in the notion that the adoption of regulatory legislation or the granting of injunctive relief in this area is precluded by the *Burbank* preemption doctrine, but that preemption does not preclude that element of control and regulation which is inherent in the granting of inverse eminent domain damages or damages for personal injury resulting from the complained-of operation. Regulation by the awarding of money damages can obviously be as much a regulation of conduct as is regulation by an injunction or legislative enactment. *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

Perhaps the justification for this inconsistency can be found in a balancing of the need for nationwide uniformity in affirmative regulation of aviation operations against the apparent necessity of providing a means by which those whose personal and property interests have been damaged may obtain appropriate redress.

### III

### AMENDMENT OF MUNICIPAL STATEMENT OF LAND DEVELOPMENT POLICIES

■ We now proceed to consider the issues raised on appeal by plaintiffs concerning the dismissal of Count IV of their complaint.

Plaintiffs' Count IV was entitled "Violation of Master Plan Amendment Provisions" and was based upon the premise that the City of Scottsdale could not extend the existing runway at Scottsdale Municipal Airport without amending its "master plan" previously adopted pursuant to the provisions of A.R.S. § 9–461.05, *et seq.* The defendants contend that no amendment of the master plan was required in order to implement their decision to extend the runway, and that therefore there was no necessity to comply with the provisions of A.R.S. § 9–461.06 governing master plan amendments.[7] The trial court agreed that no amendment of the master plan was necessary, and since there was no contention that the defendant city council had not otherwise validly exercised its proprietary and governmental powers from a procedural standpoint, dismissed plaintiffs' request for declaratory relief. We affirm.

It is uncontroverted that in its existing master plan the city has complied with the provisions of A.R.S. § 9–461.05 by showing the location of the airport in question.

---

**6.** A.R.S. § 2–333, in pertinent part, provides:

"This article does not authorize the governing body of a city, town or county to restrict or limit the length or width of an airstrip or runway used for the landing and takeoff of aircraft. Any such restriction or limitation is void."

Substantially identical language is found in A.R.S. §§ 2–301 B and 2–309 B.

**7.** During oral argument this court was advised by defendants' counsel that appropriate steps have now been taken to amend the master plan so as to arguably moot any question raised by plaintiffs in Count IV. Since such action was not made a part of the record before the trial court or by proper motion filed in this court, we have not considered these assertions by counsel in disposing of the issues raised concerning Count IV.

Plaintiffs urge that the proposed extension of the runway constituted "a significant land use alteration so that the master plan was required to be amended."

While the governing statutes enabling the adoption and amendment of general plans by municipalities provide no specific standards detailing the circumstances under which a general plan must be amended, we believe that some guidance can be obtained from a review of the authorizing statutes. A.R.S. § 9–461(1) defines the term "general plan" as meaning "a municipal statement of land development policies, which may include maps, charts, graphs and text which set forth objectives, principles and standards for local growth and redevelopment enacted under the provisions of this article or any prior statute." A.R.S. § 9–461.01 provides for the enactment of a general plan and requires the development of "such specific plans as may be necessary to implement the general plan." A.R.S. § 9–461.05 A and C speak in terms of the adoption of "a comprehensive, long-range general plan for the development of the municipality . . . [which] shall consist of a statement of community goals and development policies." For cities of over 50,000 population, there shall be included within the general plan "[a] transportation element showing a comprehensive transportation system" which may also include "aviation and related facilities." See A.R.S. § 9–461.05 D(3)(a). After the adoption of a general plan, the planning agency is required to investigate and make recommendations to the legislative body "in order that it will serve as a pattern and guide for the orderly growth and development of the municipality . . . ." A.R.S. § 9–461.07 A(1).

While the general plan concept is a part of the overall legislation enabling the implementation of land use planning by municipalities, it is not to be confused with the exercise by a municipality of its zoning powers, although all of the municipality's zoning ordinances or regulations must be consistent with the municipality's general plan. See A.R.S. § 9–462.01 E. We find no indication in the statutory scheme relating to the adoption of general plans that specificity to the extent urged by plaintiffs was

intended so as to require the invocation of the burdensome statutory mechanism for general plan amendments when construction or expansion within a previously set forth category of use is contemplated. Obviously, here the contemplated use would remain the same, and while any increase in air traffic will just as obviously affect the use and enjoyment by the plaintiffs of their property, such an increase in use should not have been entirely unexpected from a planning standpoint in view of the entire area's expanding development. In conclusion, we agree with defendants that a general plan is just that, a "general" plan. The statutes do not indicate any intent that the general plan go into such minute detail as to specify the precise length of an airport runway. As Professor Schroeder has concisely stated:

> "The general plan is primarily a statement of community policies and objectives. Although maps and diagrams may be part of the plan, the plan does not necessarily freeze land uses or establish fixed land use patterns, as a zoning map might do. Consequently, a city may use its general plan to outline goals which the municipality seeks to implement through more specific plans and regulations." Schroeder, "Public Regulation of Private Land Use in Arizona: An Analysis of Its Scope and Potential, 1973 Law and the Social Order," 747, 763 (footnote omitted).

The trial court did not err in dismissing plaintiffs' Count IV.

## IV

### STANDING TO SEEK ENFORCEMENT OF FEDERAL REGULATIONS

We now proceed to a consideration of the final issue raised by plaintiffs on appeal. This issue concerns the dismissal of that portion of Count III of plaintiffs' complaint which sought relief based upon allegations of defendants' responsibility for violation of state and federal law governing flight operations by flight operators.

■ Specifically, Count III alleged violations of A.R.S. § 28–1741 et seq. and federal regulations pertaining to flight operations, 14 C.F.R., Part 91. The complaint sought

only injunctive relief based upon these violations. Additionally, at oral argument counsel for appellants conceded that the issues on appeal related to prospective damage only, not damages already incurred. Therefore we do not consider whether this count states a claim for which damages can be awarded based upon any negligence theory. Under the preemption analysis applied to the relief sought in Counts I (trespass) and II (nuisance), to the extent that this same relief is sought in Count III, it is unavailable. The court cannot formulate injunctive relief based on state statutes regulating flight operations because the federal statutory scheme precludes additional regulation of flight.

 The only question remaining for resolution is whether the court can enjoin future violations of federal flight regulations. Can these plaintiffs seek state court injunctive enforcement of the federal regulations here involved? We hold that such relief is unavailable to them.

The Federal Aviation Act clearly delineates those parties who may seek judicial enforcement of aviation regulations:

"§ 1487. Judicial enforcement; jurisdiction; application; costs

"(a) *If any person violates any* provision of this chapter, or any rule, *regulation,* requirement, or order thereunder, or any term, condition, or limitation of any certificate or permit issued under this chapter, *the Board or Administrator*, as the case may be, their duly authorized agents, *or, in the case of a violation of section 1514 of this title, the Attorney General, or, in the case of a violation of section 1371(a) of this title, any party in interest, may apply to the district court* of the United States, for any district wherein such person carries on his business or wherein the violation occurred, *for the enforcement of such provision of this chapter*, or of such rule, regulation, requirement, order, term, condition, or limitation; *and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction* or other process,

mandatory or otherwise, restraining such person, his officers, agents, employees, and representatives, from further violation of such provision of this chapter or of such rule, regulation, requirement, order, term, condition, or limitation, and requiring their obedience thereto." 49 U.S.C. § 1487(a) (1976). (Emphasis added).

Under this statute violations of all regulations may be enjoined by the board or administrator.[8] On the other hand, a "party in interest" may apply for an injunction only in those cases involving violations of 49 U.S.C. § 1371 (1976 and Supp. 1981) relating to certificates of public convenience and necessity. We construe this statute to preclude direct injunctive enforcement of any other FAA regulation by a private "party in interest". The federal regulations which plaintiffs alleged to have been violated do not emanate from 49 U.S.C. § 1371(a). Therefore injunctive relief is not available to them. A private party is not completely without a remedy for regulation violations; that remedy, however, is administrative. A complaint may be filed with the Federal Department of Transportation, which must investigate the charges and can issue orders compelling compliance. 49 U.S.C. § 1482 (1976 and Supp.1981).

We hold that the plaintiffs are not proper parties to seek direct judicial enforcement of federal flight operation regulations. We therefore need not determine whether the federal regulations could be enforced through state court action rather than through federal courts, if plaintiffs were proper parties.

The judgment entered by the trial court is affirmed. The matter is remanded for further proceedings concerning plaintiffs' claims relating to water diversion and their claims for money damages.

JACOBSON and WREN, JJ., concur.

---

8. This authority has been transferred to the Secretary of Transportation and the Federal Aviation Administrator. 49 U.S.C. § 1655(a), (c) and (d) (1976).