Harold KRUEGER, d/b/a Krueger's Lawn Capitol, Plaintiff-Respondent-Cross-Appellant,

v.

Dean W. MITCHELL and Lois Mitchell, Defendants-Appellants-Cross-Respondents-Petitioners.

Supreme Court

No. 81-247. Argued January 4, 1983.—Decided April 26, 1983.

(Also reported in 332 N.W.2d 733.)

For the defendants-petitioners there was a brief by *James J. Caldwell* and *Rummel, Caldwell & Daly,* Milwaukee, and oral argument by *James J. Caldwell.*

For the plaintiff-respondent there was a brief by *Robert C. Burrell, Jeffrey S. Fertl* and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee, and oral argument by *Mr. Fertl.*

BEILFUSS, C.J.   This is a review of a decision of the court of appeals[1] which affirmed the judgment of the circuit court for Waukesha County, MAX RASKIN, Reserve Circuit Judge, presiding, in favor of the plaintiff in a private nuisance action.

In 1969 the plaintiff, Harold Krueger, commenced the operation of Krueger's Lawn Capitol, a lawn and garden supply and equipment store across the road from the Capitol Drive Airport (Airport). In 1977 the defendants, Dean and Lois Mitchell, purchased the Airport which had been in operation over 25 years. The Airport, although privately owned, is open for public use.

Prior to 1978 the Airport had no paved runways, rather the Airport had two grass runways. One runway ran along the west border of the Airport in a north-south direction, and the other runway ran along the north border in an east-west direction. In the fall of 1978 the defendants began construction of a paved runway which would run in a north-east/south-west direction, thus channeling ascending and descending aircraft in a path directly over the plaintiff's building. This paved runway was constructed for safety reasons in that it provided a longer runway distance than the unpaved north-south runway, and because the unpaved runways often became unsafe due to precipitation.

Krueger commenced this action in November of 1978, claiming that the paved runway would create a nuisance. He alleged that because the paved runway, unlike the unpaved runways, channeled flights directly over his business, the noise emanating from the airplanes would interfere with the use and enjoyment of his business. He sought an injunction enjoining the defendants from constructing the runway.

Krueger obtained an *ex parte* order restraining the Mitchells from continuing work on the runway. Follow-

[1] *Krueger v. Mitchell*, 106 Wis. 2d 450, 317 N.W.2d 155 (1982).

ing a hearing the trial court denied the plaintiff's request for a temporary injunction and dissolved the *ex parte* order. The plaintiff was then allowed to amend his complaint to request damages for the annoyance, inconvenience and discomfort caused by the noise emanating from the planes using the runway. Construction of the paved runway was subsequently completed.

In August of 1980 a jury trial was held. There was no evidence presented that the Airport was operating in violation of the law, and the only damages claimed were the annoyance, discomfort and inconvenience caused by the aircraft noise. The jury returned a verdict finding that the operation of the airport since 1978 constituted a nuisance. It awarded $2,000 for past damages and $10,000 for future damages. The trial court held that the jury could reasonably have found the Airport to constitute a nuisance but that the evidence was insufficient to support the amount of damages awarded. It therefore reduced the award to $500 for past injury and $2,500 for future annoyance, inconvenience and discomfort. The plaintiff accepted this remittitur and judgment was entered in favor of the plaintiff. The defendants appealed.

The court of appeals affirmed. The court concluded that there was sufficient evidence to support the jury's finding that the Airport constituted a nuisance, and the amount of damages awarded by the trial court. It also held that the plaintiff could recover damages for personal inconvenience, annoyance and discomfort caused by a nuisance even in the absence of any showing of monetary loss or bodily injury. We accepted the defendants' petition for review.

The first issue on review is whether Congress, by the enactment of the Federal Aviation Act of 1958 (Act), 49 U.S.C., sec. 1301 *et seq.,* as amended, preempted the field of aviation noise control to the exclusion of private nuisance actions against owners of private airports.

The doctrine of preemption, a corollary to the supremacy clause of the United States Constitution, art. VI, cl. 2, invalidates state or local government regulation that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). Under the the concept of preemption, federal regulation may preclude state or local action in the same area only if it was the clear and manifest purpose of Congress to supersede state authority. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). "The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained." *Florida Avocado Growers v. Paul,* 373 U.S. 132, 142 (1963). Where Congress has not expressly stated its intent to preempt an area of commerce, the Supreme Court has enunciated the grounds for inferring that such intent as follows:

"The scheme of federal regulation may be so persuasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co. v. Public Service Comm'n,* 250 U.S. 566, 569; *Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines v. Davidowitz,* 321 U.S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co. v. Railroad Commission,* 236 U.S. 439; *Charleston & W.C.R. Co. v. Varnville Co.,* 237 U.S. 597; *New York Central R. Co. v. Winfield,* 244 U.S. 147; *Napier v. Atlantic Coast Line R. Co., supra.* Or the state policy may produce a result inconsistent with

the objective of the federal statute. *Hill v. Florida,* 325 U.S. 538." *Rice,* 331 U.S. at 230.

Under these principles, in order for common law nuisance actions based on aircraft noise to be preempted by the Act, Congressional intent to do so must be clear. The United States Supreme Court addressed the issue of federal preemption of aviation noise control in *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624 (1973). In *Burbank,* the court held that Congress, by the 1968 and 1972 amendments to the Act, had given "full control over aircraft noise" to the Federal Aviation Administration (FAA) "pre-empting state and local control." *Id.* at 633. The court relied on the pervasive nature of the federal scheme for aviation noise abatement, stating:

"Control of noise is of course deep-seated in the police power of the States. Yet the pervasive control vested in EPA and in FAA under the 1972 Act seems to us to leave no room for local curfews or other local controls. What the ultimate remedy may be for aircraft noise which plagues many communities and tens of thousands of people is not known. The procedures under the 1972 Act are under way. In addition, the Administrator has imposed a variety of regulations relating to takeoff and landing procedures and runway preferences. The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground. 49 U.S.C. § 1348(c). Any regulations adopted by the Administrator to control noise pollution must be consistent with the 'highest degree of safety.' 49 U.S.C. § 1431(d)(3). The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled." *Id.* at 638–39.

The Mitchells contend that the preemption found in *Burbank* extends to private nuisance actions against air-

port owners and that they can not be held liable in the absence of evidence that the airport was operating in violation of federal law. We conclude that their reliance on *Burbank* is misplaced. While the decision speaks in broad terms of the preemption of any state or local control of aircraft noise, the court, in footnote 14 of the opinion, specifically limited its holding to the attempt by a state or local government to regulate aircraft noise through its police power, stating:

"But, we are concerned here not with an ordinance imposed by the City of Burbank as 'proprietor' of the airport, but with the exercise of police power. While the Hollywood-Burbank Airport may be the only major airport which is privately owned, many airports are owned by one municipality yet physically located in another. For example, the principal airport serving Cincinnati is located in Kentucky. Thus, authority that a municipality may have as a landlord is not necessarily congruent with its police power. *We do not consider here what limits, if any, apply to a municipality as a proprietor.*" (Emphasis supplied.) 411 U.S. at 636, n 14.

After an intensive examination of the legislative history of the amended Act, the court drew a careful distinction between the police power of a local government and the proprietorial powers of an airport owner. The extent of the proprietor's power to regulate aircraft noise was expressly not decided in *Burbank.* Thus we must independently examine the legislative history of the aviation noise abatement amendments to the Act to determine if Congress intended to preempt nuisance actions against an airport proprietor.

The Federal Aviation Act, which describes the federal government's powers and duties with respect to air commerce, was originally enacted in 1958. The Act declared that the United States of America possessed and exercised complete national sovereignty in the airspace of

the United States, sec. 1508(a),[2] and the FAA was given broad authority to promulgate regulations governing the use of navigable airspace to provide for the safety of aircraft and persons and property on the ground, and to effect the efficient use of the airspace, sec. 1348. As originally enacted, the Act contained no provision specifically dealing with the regulation of aircraft noise.

The Act was amended in 1968 to add sec. 1431, which authorized and required the Administrator of the FAA to prescribe rules and regulations to control and abate aircraft noise "[i]n order to afford present and future relief and protection to the public from unnecessary aircraft noise. . . ."[3] The Senate Report filed by the commerce committee concurred in the views set forth by then Secretary of Transportation Boyd as to whether the proposed amendment would " 'to any degree preempt State and local government regulation of aircraft noise and sonic boom.' " *Burbank,* 411 U.S. at 635.

The letter as quoted by the *Burbank* court stated:

" 'The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft . . . . H.R. 3400 would merely expand the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft.' " 411 U.S. at 635.

The court further quoted the letter as follows:

". . . 'the proposed legislation will not affect the rights of a State or local public agency, *as the proprietor of an airport,* from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners *acting as proprietors,* can presently deny the use of their

---

[2] All statutory reference are to 49 USC unless otherwise indicated.

[3] Pub. L. 90–411, 82 Stat 395 (1968).

airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.' (Emphasis added.)'' 411 U.S. at 635–36.

Although not quoted by the majority, the letter goes on to state:

" ' "Just as an airport owner is responsible for deciding how long the runways will be, so is the owner responsible for obtaining noise easements necessary to permit the landing and takeoff of the aircraft. The Federal Government is in no position to require an airport to accept service by larger aircraft and, for that purpose, to obtain longer runways. Likewise, the Federal Government is in no position to require an airport to accept service by noisier aircraft, and for that purpose to obtain additional noise easements. The issue is the service desired by the airport owner and the steps it is willing to take to obtain the service. In dealing with this issue, the Federal Government should not substitute its judgment for that of the States or elements of local government who, for the most part, own and operate our Nation's airports. The proposed legislation is not designed to do this and will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations." ' "[4]

In approving this letter the Senate Report stated that it was " 'not the intent of the committee in recommending this legislation to effect any change in the existing apportionment of the powers between the Federal and State and local governments.' " *Burbank*, 411 U.S. at 635.

Four years later Congress passed the Noise Control Act of 1972[5] which amended sec. 1431. The EPA was required to submit noise control and abatement regulations to the FAA that it determined to be "necessary to protect the public health and welfare."[6] The Senate Re-

[4] S. Rep. No. 1353, 90th Cong. 2d Sess. 7, reprinted in 1968, U.S. Code Cong. & Ad. News 2688, 2694. *See also, Burbank,* 411 U.S. at 649–50 (Rehnquist, J. dissenting).

[5] Pub. L. 92–574, 86 Stat 1234 (1972).

[6] For a detailed discussion of the 1972 Act, *see Burbank,* 411 U.S. at 628–33.

port by the Public Works Committee in discussing the preemptive effect of the 1972 Act stated:

"States and local governments are preempted from establishing or enforcing noise emission standards for aircraft unless such standards are identical to standards prescribed under this bill. *This does not address responsibilities or powers of airport operators, and no provision of the bill is intended to alter in any way the relationship between the authority of the Federal government and that of State and local governments that existed with respect to matters covered by section 611 of the Federal Aviation Act of 1958 prior to the enactment of the bill.*" (Emphasis added.)[7]

This examination of the legislative history of the 1968 and 1972 amendments to the Act leads to the conclusion that Congress did not intend to entirely preempt the field of aviation noise control. Rather, as recognized in *Burbank,* before the amendments to the Act Congress had preempted the control of flights through navigable air space. The 1968 and 1972 amendments merely strengthened the FAA's regulatory role in this preempted area by authorizing it (in conjunction with the EPA) to regulate the noise levels of aircraft in flight. State and local government, through their police powers, cannot regulate noise levels by regulating the flight of aircraft.

In conjunction with this, the legislative history clearly indicates that Congress did not intend to preempt airport proprietors' traditional control over the ground facilities of airports, including regulation of the noise levels created by the operation of the particular airport. Rather, under the amended Act airport proprietors continue to have the primary responsibility for regulating and controlling the noise level of the particular airport

[7] S. Rep. 92–1160, 92nd Cong. 2d Sess. 11, reprinted in 1972 U.S. Code Cong. & Ad. News 4655, 4663.

in order to meet the local needs of the surrounding community. It is the airport owner who has the primary control over airport planning, design, operation and maintenance. As stated in the 1976 Noise Abatement Policy Statement issued by the FAA and the Department of Transportation:

"[a]irport proprietors are primarily responsible for planning and implementing action designed to reduce the effect of noise on residents of the surrounding area. Such actions include optimal site location, improvements in airport design, noise abatement ground procedures, land acquisition, and restrictions on airport use that do not unjustly discriminate against any user, impede the federal interest in safety and management of the air navigation system, or unreasonably interfere with interstate or foreign commerce.

. . . . . .

"We have been urged to undertake—and have considered carefully and rejected—full and complete federal preemption of the field of aviation noise abatement. In our judgment the control and reduction of airport noise must remain a shared responsibility among airport proprietors, users, and governments."[8]

Because Congress has refused to preempt the entire field of aviation noise abatement, but rather has continued to allow airport proprietors to exercise substantial control over airport facilities in order to control airport noise in light of the needs of the particular community, it follows that airport proprietors are amenable to nuisance actions alleging that such control decisions result in unreasonable noise levels. If the proprietor wishes to open the airport to larger and noisier aircraft, or designs or locates the airport in such a way as to unreasonably interfere with the use and enjoyment of

[8] FAA and DOT Noise Abatement Policy Statement at 5, 18 (Nov. 18, 1976), as quoted in part by *DiPerri v. Federal Aviation Administration*, 671 F.2d 54, 58 (1st Cir. 1982).

neighboring lands, the proprietor must obtain the necessary noise easements, *Griggs v. Alleghany County,* 369 U.S. 84 (1962), or be liable in tort to persons injured by the consequences of these decisions. "The issue is the service desired by the airport owner and the steps it is willing to take to obtain the service." S. Rep. No. 1353, 90th Cong. 2d Sess. 7 (1968).

The proprietorial control decisions causing the nuisance may be deemed necessary to obtain the safest and most efficient operation of the airport, but if such decisions create noise levels that unreasonably interfere with adjoining landowners' use of their property the proprietor can be required to compensate the injured parties. This is merely one of the costs of running a safe and efficient airport. Our holding that nuisance actions are not preempted by the Act based on the so-called "proprietary exception" is in accord with the decisions of courts in other jurisdictions. *See Northeast Phoenix v. Scottsdale Mun. Airport,* 130 Ariz. App. 487, 636 P.2d 1269 (1981) ; *Owen v. City of Atlanta,* 157 Ga. App. 354, 277 S.E.2d 338, aff'd 248 Ga. 299, 282 S.E.2d 906 (1981), cert. denied, 456 U.S. 972 (1982) ; *Wood v. City of Huntsville,* 384 So. 2d 1081 (Ala. 1980) ; *Greater Westchester v. City of Los Angeles,* 26 Cal. 3d 86, 603 P.2d 1329 (1979), cert. denied, 446 U.S. 933 (1980) ; *contra, Luedtke v. County of Milwaukee,* 371 F. Supp. 1040 (E.D. Wis. 1974), aff'd 521 F.2d 387 (7th Cir. 1975).[9]

The conclusion that Congress did not intend to preempt common law nuisance actions against airport proprietors for unreasonable noise levels is also supported by sec. 1506 of the Act, which provides:

---

[9] Two federal courts, in dicta, have also recognized that nuisance actions claiming damages are still viable under the amended Act, also relying on the "proprietary exception." *DiPerri v. Federal Aviation Administration,* 671 F.2d 54, 57 (1st Cir. 1981) ; *San Diego Unified Port Dist. v. Gianturco,* 651 F.2d 1306 (9th Cir. 1981), cert. denied, 102 S. Ct. 1631 (1982).

"Sec. 1506. *Remedies not exclusive*

"Nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies."

The United States Supreme Court in *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 298 (1976), interpreted this "savings clause" and held even in the absence of such a clause a common law right is not abrogated " 'unless it be found that the preexisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory.' " The court went on to state that a common law action survives the Act unless the action is "absolutely inconsistent" with the Act. *Id.* at 300.

■

Because many common law nuisance actions request injunctive relief as well as damages, we must separately consider these two remedies in determining whether the maintenance of a nuisance action is "absolutely inconsistent" with the Act. Looking first to a state court award of damages, we hold that such a remedy survives the Act. We believe that holding a proprietor liable for damages caused by unreasonable noise levels would not hamper national aviation noise abatement policy. Such an award of damages merely requires the proprietor to pay for the type of service he or she desires to provide at the airport. This is totally consistent with Congressional intent. Congress' refusal to remove control of noise abatement from airport proprietors requires this conclusion.

■

Applying sec. 1506 to the common law remedy of injunctive relief yields a very different result. Allowing state court ordered injunctions to abate an aircraft noise

nuisance would have such a severe impact on the free flow of air commerce that such remedy cannot co-exist with the Act. If state courts were allowed to enjoin the operation of all or part of an airport based on nuisances to neighboring property, air commerce would be completely disrupted. Airport proprietors must be allowed, within federal laws and regulations, to choose the type of service to be provided at our nation's airports, taking into account the safety of those in the aircraft and on the ground, the most efficient use of airport facilities and the needs of the surrounding community. We believe injunctions prohibiting such proprietorial decisions are completely preempted under the Act. This preemption of injunctive relief in aviation noise nuisance actions extends to all types of injunction, including the injunction originally sought in this case, which was directed not at the actual flight of the aircraft but at decisions made by the proprietor as the ground facilities. The free flow of air commerce requires that the airport proprietor be free to make and implement such airport planning and operating decisions, subject only to federal requirements and the obligation to compensate those who are injured by such decisions. *Northeast Phoenix v. Scottsdale Mun. Airport,* 130 Ariz. App. at 495; *Greater Westchester v. City of Los Angeles,* 26 Cal. 3d at 94, 100.

We therefore hold that injunctive relief is completely preempted in aviation noise nuisance actions because of the disruptive impact such a remedy would have on air commerce. However, nuisance actions claiming damages only are not preempted by the Act. Such liability on the part of the airport proprietor follows from the clear Congressional intent to vest primary responsibility for protecting local residents from airport noise in the proprietor rather than the federal government. We view this liability to be akin to the remedy of inverse condemnation in the sense that such a claim should deter-

mine not only past damages but also future damages from the noise nuisance. The injured party must therefore present his or her entire claim for past and future damages in one action. This limitation on such a damage action is necessary in order to protect airport proprietors from repeated and vexatious litigation based on the same nuisance.

The second issue raised on this review is whether an airport which is operating in conformance with state and federal law can constitute a nuisance. The Mitchells urge this court to adopt the rule that an airport which is operating lawfully can not constitute a private nuisance. Well established principles of Wisconsin law require us to reject the defendants' position.

A private nuisance has been defined by this court as an unreasonable interference with the interests of an individual in the use and enjoyment of land. *Hoene v. Milwaukee,* 17 Wis. 2d 209, 214, 116 N.W.2d 112 (1962). It is well established that a business or activity may constitute a private nuisance even though it is operating in conformity with the law. "Even though a business may be lawful, nevertheless it may be conducted in such a way as to amount to a nuisance either because of its location, as in *Hasslinger v. Hartland* (1940), 234 Wis. 201, 290 N.W. 647, or because of the effect of its operation." *Sohns v. Jensen,* 11 Wis. 2d 449, 460, 105 N.W.2d 818 (1960). We find these rules to be equally applicable to the operation of an airport.

The defendants contend that this court's decision in *Kuntz v. Werner Flying Service, Inc.,* 257 Wis. 405, 43 N.W.2d 476 (1950), mandates a different result. *Kuntz* involved a nuisance action against an airport seeking only injunctive relief. This court affirmed the trial court's order dismissing the claim for injunctive relief, finding that injunctive relief was inappropriate because

the airport was operating in conformity with state and federal law. This holding is in accord with our holding in this action that injunctions are preempted in airport nuisance actions which do not allege violation of federal law.

However, the language used by the court in *Kuntz* can be read to imply that an airport which is operating lawfully can not constitute a nuisance.[10] Any such implication is hereby rejected. First, the court in *Kuntz* was concerned solely with the issue of injunctive relief. Thus, the language has no application to a nuisance claim requesting damages. Secondly, the *Kuntz* court recognized in dicta that a damages action was still viable when it stated that "the plaintiff has adequate remedy at law for any future damages, if any, he may sustain." *Id.* at 411. Thus, we construe *Kuntz* to hold that although injunctive relief is unavailable in an airport nuisance action where there is no violation of the applicable law, damages may still be recovered. Therefore, based on *Kuntz* and general principles of nuisance law, we hold that an airport which unreasonably interferes with the use and enjoyment of adjacent property can constitute a nuisance, even though such an airport is operating in accordance with federal and state law.

The next issue on review is whether, following the construction of the paved runway, the Capitol Drive Airport constituted a nuisance. In this case the jury returned a verdict finding that the Airport constituted a nuisance. An appellate court must sustain the jury's verdict "[i]f there is any credible evidence which under

[10] This language is as follows: "There is no evidence in the present case that the operation of defendants' airport is a nuisance in fact, for no illegal acts have been performed by the defendants. The flying is in conformity with the state and federal flying regulations." *Id.* at 410.

any reasonable view, fairly admits an inference that supports a jury's finding. . . ." *Bastman v. Stettin Mutual Ins. Co.,* 92 Wis. 2d 542, 548, 285 N.W.2d 626 (1979). In applying this standard of review the evidence must be viewed in the light most favorable to support the verdict. *Id.* Further, the determination of whether a nuisance existed is particularly a matter for the jury to determine. *Kellogg v. Village of Viola,* 67 Wis. 2d 345, 353, 227 N.W.2d 55 (1975).

The evidence, when viewed most favorably to the plaintiff, supports the jury's verdict. The thrust of the plaintiff's claim was that the newly designed and paved runway created a nuisance because it directed takeoffs and landings directly over the plaintiff's business. The evidence showed that following construction of the paved runway larger planes were able to use the airport, the total number of flights increased, and the number of flights directly over the plaintiff's business increased. Evidence was further introduced to demonstrate that all these factors caused an increase in the noise level over the plaintiff's business thus interfering with the operation of his business, and that this noise level was personally offensive to the plaintiff.

Based on this evidence the trial court denied defendants' motion after verdict, finding that there was credible evidence to support the jury's decision. The court of appeals affirmed. We agree that there was credible evidence to support the jury's verdict. We will therefore not upset the verdict on review, especially in light of the fact that the verdict was approved by both lower courts.

The final issue on review is whether a plaintiff should be permitted to recover damages for personal inconvenience, annoyance and discomfort caused by the existence of a nuisance even in the absence of any showing of monetary loss or bodily injury or illness. The Mitchells contend that because the plaintiff did not suffer actual

bodily injury or property damages as a result of the aircraft noise, he has not suffered compensable damages. We disagree.

We believe that such damages are separately and independently recoverable in a nuisance action based on the very essence of the tort of nuisance. The tort of nuisance gives legal protection to a person's interest in the unimpaired use and enjoyment of land. This protection extends not only to the preservation of the property itself but also to its enjoyable use:

"The ownership or rightful possession of land necessarily involves the right not only to the unimpaired condition of the property itself, but also to some reasonable comfort and convenience in its occupation. Thus many interferences with personal comfort, such as a dog next door which makes night hideous with his howls, which at first glance would appear to be wrongs purely personal to the landholder, are treated as nuisances because they interfere with that right to the undisturbed enjoyment of the premises which is inseparable from ownership of the property." Prosser, *Law of Torts* (4th ed.), p. 591, sec. 89 (Hornbook Series).

As long as the interference is unreasonable and substantial, rather than petty or trifling, "virtually any disturbance of the enjoyment of the property may amount to a nuisance." Prosser, *supra* at 593. *Bie v. Ingersoll,* 27 Wis. 2d 490, 493, 135 N.W.2d 250 (1965).

As stated in sec. 821F of the Restatement, 4 Torts (2d):

"There is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose."

In discussing the meaning of "significant harm," comments c and d to this section state in part:

"c. *Significant harm.* By significant harm is meant harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or a private nuisance . . . Likewise in the case of a private nuisance, there must be a real and appreciable interference with the plaintiff's use or enjoyment of his land before he can have a cause of action.

"d. *Hypersensitive persons or property.* When an invasion involves a detrimental change in the physical condition of land, there is seldom any doubt as to the significant character of the invasion. *When, however, it involves only personal discomfort or annoyance, it is sometimes difficult to determine whether the invasion is significant. The standard for the determination of significant character is the standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant. If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncracies of the particular plaintiff may make it unendurable to him.* Rights and privileges as to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be there at the time." (Emphasis supplied.) Restatement, 4 Torts (2d), sec. 821F, pp. 105–06.

The focus in determining whether a particular nuisance is actionable depends on whether the interference with the use and enjoyment of land is unreasonable and substantial. Property damages or actual physical injuries resulting from one nuisance may be so trifling as to be uncompensable, while the annoyance, inconvenience and discomfort caused by another may be great. Therefore we find that it is inappropriate to decide whether a nuisance is actionable based on the type of damages alleged, *e.g.,*

actual physical injuries or property damages as contrasted to annoyance, inconvenience or discomfort. Rather, the touchstone is whether the injuries are substantial.

Whether the injuries claimed in a particular action are substantial depends on the particular facts in light of the effect the complained of activity would have on a person of ordinary sensibilities. *Bie v. Ingersoll*, 27 Wis. 2d at 493. Therefore we hold that a plaintiff may recover for inconvenience, annoyance and discomfort caused by a nuisance as long as such interference with the use and enjoyment of the land is unreasonable and substantial.

*By the Court.*—The decision of the court of appeals is affirmed.

WILLIAM G. CALLOW, J. (*concurring*). It is undisputed that the Capitol Drive Airport had operated for many years prior to 1969, the time Krueger commenced the operation of the lawn and garden supply and equipment business. The airport was L-shaped, providing north-south and east-west turf runways. The Krueger store was located across the road, directly south of the west boundary of the airport. The flight path at that time for the north-south runway caused aircraft to fly over the area immediately east of the Krueger store.

In 1978 the defendant airport operator paved a runway which utilized the north-south runway area. In order to gain a slightly longer runway, the paved runway was moved slightly from the area of the turf runway so that it ran from the northeast corner of the north-south leg of the airport to the southwest corner. This change caused the aircraft to fly directly over the store rather than immediately to the east of the store.

Under the facts of this case, I conclude that Krueger could have been denied recovery of damages under the doctrine of "coming to the nuisance." This court has noticed this doctrine. "A plaintiff, of course, is not

*ipso facto* barred from relief in the courts merely because of 'coming to the nuisance,' but it is a factor which bears upon the question of whether the plaintiff used his land reasonably." *Abdella v. Smith,* 34 Wis. 2d 393, 401, 149 N.W.2d 537 (1967) (citing W. Prosser, *Handbook of The Law of Torts,* sec. 92, 632 (3d ed. Hornbook Series 1964). Dean Prosser also notes that a plaintiff may be barred from recovery where the defendant's activity is one in which the public has a major interest. W. Prosser, *Handbook of The Law of Torts,* sec. 91, 611 (4th ed. Hornbook Series 1971).

Here there was no enlargement of the airport. The airport had a major public interest. When Krueger established his business, the runways were grass which made them subject to modification by the simple act of mowing. The utilization of airport property for maximum safety and efficiency was clearly foreseeable. The fact that a paved runway might be installed with a slight change in direction was as foreseeable as a possible change in runway direction by mowing. The size of the property dictated the length of the runway and the type of aircraft which would use the field. This was also foreseeable.

Krueger elected to establish a business at the end of a runway. The end of the paved runway is on the site of the end of the grass runway. The maxim "volenti non fit injuria" is applicable. A plaintiff who voluntarily places himself in a situation whereby he claims to experience damage from a nuisance maintained by another should not be allowed relief. 58 Am. Jur. 2d *Nuisances* sec. 217 (1971).

It appears to me that the plaintiff could have foreseen the injury of which he complains and could have been denied recovery. I note, however, the defendants approved the instruction which was given to the jury as follows: "The fact that the Capitol Drive Airport exist-

ed and was operating on its present site when the plain-your determination of liability and damage of the burden of proof to all of these questions upon the plaintiff." tiff moved onto the adjacent property is irrelevant to

Thus, the issue upon which the defendants could have prevailed was removed from the case. Therefore, I concur with the majority.