GODFREY COMPANY, Store Equipment, Inc., Paul Holton, Trustee, Holton Food Products Company Profit Sharing Trust, Holton Food Products Company, Paul Holton, Hugh B. and Carmen Versteegh, Harold W. and Sally J. Wodicka, Orne Marital Trust and Richard C. Lofy, Plaintiffs-Respondents,†

v.

Richard J. LOPARDO and Catherine A. Lopardo, Defendants-Appellants.

Court of Appeals

*No. 90-2073. Oral argument April 18, 1991.—Decided August 28, 1991.*

(Also reported in 474 N.W.2d 786.)

---

† Petition to review denied.

---

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Dennis L. Fisher* and *William F. Brown* of *Meissner & Tierney, S.C.,* of Milwaukee, and *Carlo A. Balistrieri* of Oconomowoc.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Hugh R. Braun* and *M. Susan Maloney* of *Godfrey, Trump & Hayes* of Milwaukee.

Before Brown, Scott and Anderson, JJ.

BROWN, J.   This is an appeal by riparian owners Richard J. and Catherine A. Lopardo disputing the placement of a neighboring pier built by the Godfrey Company. The issues are numerous and protracted. It is enough to state at the outset our holding that Godfrey does not own the property from which the pier extends; it is an easement holder. We further decide that Godfrey nonetheless has a riparian right to have a pier pursuant to new sec. 30.131, Stats. We affirm a portion of the case but mainly reverse and remand to the circuit court with directions to further remand this action to the Department of Natural Resources (DNR) for a hearing on proper pier placement.

In 1976, Godfrey developed Westmoor subdivision on Middle Lake in Lauderdale Lakes. In 1977, Godfrey's wholly owned subsidiary, Store Equipment, Inc., created Southmoor subdivision on land without lake frontage

adjoining Godfrey's Westmoor subdivision. Godfrey granted Southmoor an easement across the north forty feet of Westmoor's Lot 3 to give the Southmoor owners lake access. The easement was recorded. Godfrey also built a ninety-foot pier off the end of the easement. The pier with pier slips was thirty-seven feet wide and was constructed on an area of the lake bed lying within the extended lot lines of the forty-foot easement. This followed the "straight line" method of determining riparian rights. After Godfrey constructed the pier, Store Equipment recorded a pier slip agreement granting to. future owners of Southmoor the right to buy pier slips.

Godfrey sold Lot 3 to the Lopardos in 1985. The easement was mentioned in the Lopardos' offer to purchase Lot 3 which contained the following description of the property: "Lot 3 Westmoor Subdivision (except the North 40 feet which has been designated as an easement for Southmoor Subdivision pier slips). . . ." This exception clause was not included in the title insurance commitment or in the deed to the property.

In 1987, the Lopardos had their lot surveyed so they could build a pier. Because the shoreline is irregular and the lot lines do not form right angles with the shoreline, the surveyor used the "Knitter method" of surveying riparian rights, also called the "coterminous riparian rights lines" method by Wis. Adm. Code sec. **NR 326.07(2)(b)**. Using this method, the riparian lines bend to the north of where they would fall if the "straight line" method were used. The Knitter method revealed that the Godfrey pier encroached the Lopardos' riparian space and did not leave sufficient area for boat traffic if the Lopardos were to build a pier to a navigable depth of water. However, if the Lopardos used the straight line method to determine their riparian space for a pier, they would infringe on the riparian space of

the lot owner to the south of their property, just as the Godfrey pier infringed on their riparian space.

The Lopardos requested an investigation by the ·DNR which informed the Lopardos that the Godfrey pier interfered with the Lopardos' riparian rights. The Lopardos then requested a formal hearing before the DNR, pursuant to sec. 30.14(2), Stats. The DNR wrote to Godfrey suggesting that it move the pier. The DNR also sent Godfrey copies of two cases decided by this court which potentially raised questions about the pier, the easement, and the ownership of the pier slips because the cases held that an easement holder does not have riparian rights. *See Cassidy v. DNR,* 132 Wis. 2d 153, 390 N.W.2d 81 (Ct. App. 1986), and *de Nava v. DNR,* 140 Wis. 2d 213, 409 N.W.2d 151 (Ct. App. 1987).[1] In light of the holdings of *Cassidy* and *de Nava,* the Lopardos, as the owners of Lot 3, potentially would have exclusive control over the placement and maintenance of the pier, in spite of the easement and the pier slip agreement with Southmoor owners.

Godfrey filed a complaint in circuit court, claiming error in the drafting of the deed to the Lopardos and seeking reformation of the deed to remove the forty-foot strip from the description. Godfrey also sought a declaratory judgment of its riparian rights relative to the pier.[2] The Lopardos counterclaimed, seeking to have the pier moved or removed in view of their riparian rights.

Godfrey moved for summary judgment on the reformation issue. On October 12, 1989, Judge John R. Race

[1]The legislature subsequently enacted sec. 30.131, Stats., which provided that a pier could be constructed off an easement. The application of that statute to this case will be considered later in this opinion.

[2]Godfrey was joined in the suit by Store Equipment, Inc., and by the owners of the pier slips.

granted partial summary judgment to the Lopardos, finding that no facts were in dispute, the offer to purchase was ambiguous, and the offer should be construed as recognizing an easement over Lot 3 rather than excepting from the sale the underlying fee of Lot 3's north forty feet. Judge Race issued an order dismissing the deed reformation claim.

Subsequently, the Lopardos moved for summary judgment on the riparian rights issue. That motion was heard in March 1990 by Judge James L. Carlson, who succeeded Judge Race by judicial rotation. Judge Carlson denied the Lopardos' motion because he viewed the riparian rights issue as a mixed question of fact and law which could not be settled by summary judgment. Godfrey then filed a motion to vacate Judge Race's prior summary judgment on the reformation issue. Godfrey based its argument on Judge Race's conclusion that the offer to purchase was ambiguous. From this, Godfrey argued that Judge Race's summary judgment of the reformation claim was inappropriate because the resolution of ambiguity in documents involves a factual determination. Judge Carlson granted Godfrey's motion and vacated Judge Race's prior order.

There was a bench trial in June 1990. After trial, the court issued a judgment reforming the deed to include the exception clause found in the offer to purchase. The judgment also awarded the underlying fee of the north forty feet of Lot 3 to Godfrey. It further declared that Godfrey had riparian rights to use and maintain the pier where it was located and the Lopardos were estopped from claiming the pier violated their riparian rights.

As a threshold issue, the Lopardos question whether Judge Carlson had the authority to review, let alone vacate, Judge Race's partial summary judgment. This

presents a question of law which we review *de novo. See First Nat'l Leasing Corp. v. City of Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

The Lopardos claim that Judge Carlson did not have the authority to review Judge Race's summary judgment because the "law of the case" doctrine prevents judges of coordinate jurisdiction from acting as reviewing courts to one another. We note, however, that Judge Carlson did not share concurrent authority with Judge Race. Nor was Judge Carlson acting as a reserve judge temporarily substituting for Judge Race. Judge Carlson was a successor judge as a result of judicial rotation. The law in Wisconsin is that

> a successor judge may in the exercise of due care modify or reverse decisions, judgments or rulings of his predecessor if this does not require a weighing of testimony given before the predecessor and so long as the predecessor would have been empowered to make such modifications. The underlying rationale . . . is that the power to modify a judicial ruling resides in the court and not in the person of the individual judge, who is merely the personification of the power, of the court.

*Starke v. Village of Pewaukee,* 85 Wis. 2d 272, 283, 270 N.W.2d 219, 224 (1978).

The record of the summary judgment proceeding before Judge Race contains no evidence that Judge Race heard testimony on the reformation issue. Moreover, Judge Race would have been empowered to vacate the partial summary judgment himself if he had not rotated off the case. Section 806.07(1)(h), Stats., gives a trial court discretion to order relief for "[a]ny . . . reasons justifying relief from the operation of the judgment."

Judge Carlson succeeded to Judge Race's discretionary authority to vacate his own partial summary judgment.

A second threshold issue is raised by the Lopardos. They argue that even if Judge Carlson had the authority to review the partial summary judgment, the judge should have declined to do so on judicial estoppel grounds. Godfrey's original motion for summary judgment alleged that there was no factual dispute regarding intent but that a mutual mistake of fact had been made by both parties relative to the deed. After Judge Race denied summary judgment to Godfrey and instead granted summary judgment to the Lopardos, Godfrey's subsequent motion to Judge Carlson alleged that the underlying intent of the parties *was* in dispute. The Lopardos contend that Godfrey cannot have it both ways—it cannot try for a victory claiming one thing and, when that does not work, claim the opposite before a different judge.

■ We have previously written about "judicial estoppel" in *In re H.N.T.,* 125 Wis. 2d 242, 253, 371 N.W.2d 395, 400 (Ct. App. 1985). A party may be estopped from asserting a cause in a judicial action or proceeding if he or she maintains positions contrary to or inconsistent with those previously asserted. *Id.* That is not the case here. Although it is true that Godfrey's original motion claimed no facts were in dispute, that motion was focused solely upon the words contained within the four corners of the deed. Judge Race failed to confine himself to the four corners of the deed but instead looked also to the offer to purchase. After looking at both the deed *and* the offer to purchase, the judge made his decision as a matter of contract interpretation. Judge Race thus widened the inquiry.

363

In the motion before Judge Carlson, Godfrey focused not on the wording of the deed—which Godfrey previously had claimed failed to include the offer to purchase—but upon the language within the offer to purchase. As to this document, Godfrey claimed that the words were ambiguous. Thus, Godfrey was not taking a position contrary to a previous one. It was not saying that there was now a factual dispute about the deed, but rather was saying there was a factual dispute about the meaning of the ambiguous offer to purchase.

We further note that judicial estoppel is an equitable doctrine. *See State v. Mendez,* 157 Wis. 2d 289, 294, 459 N.W.2d 578, 580 (Ct. App. 1990). Basic principles of justice are involved. *Id.* Originally, Godfrey brought its summary judgment motion based only on the four corners of the deed. Judge Race himself brought the offer to purchase into the equation and then opined that the offer to purchase was ambiguous. Based upon this widening of the issue, Godfrey did not violate the principles of justice by bringing a motion before Judge Carlson claiming that the offer to purchase was ambiguous and required a factual finding on the parties' intent. We reject the Lopardos' judicial estoppel argument.

Having decided the threshold issues, we now turn to the merits of Judge Carlson's decision. We look first at the reformation dispute, which actually includes two issues, although the parties do not clearly so state. These issues are: first, whether the exception clause of the offer to purchase should be included in the deed; and, second, what the meaning of the exception clause is if it is included.

Regarding the first issue on the inclusion of the exception clause in the deed, Judge Carlson made a find-

ing of fact that the clause was omitted from the deed through mutual mistake. The Lopardos contend that there was no clear and convincing evidence of a mutual mistake in the drafting of the deed. On appeal, the findings of fact of the trial court shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643–44, 340 N.W.2d 575, 577 (Ct. App. 1983).

The trial court heard testimony from the president of the title insurance company that the only reason the exception clause in the offer to purchase, signed by both parties, was not included in the legal description prepared by his title company was because an inexperienced title officer prepared the title commitment and inadvertently omitted the exception clause. Moreover, Mr. Lopardo submitted an affidavit and testified at trial that he understood at all times during the sales transaction that Lot 3 was subject to an easement. These two witnesses provided sufficient evidence for the court to conclude that the exception clause had been deleted from the deed by mutual mistake. Therefore, we affirm the court's reformation of the deed to include the exception clause.

However, including the clause in the reformed deed did not solve the underlying dispute between the parties because the clause was ambiguous. The clause gave the description of the property as: "Lot 3 Westmoor Subdivision (except the North 40 feet which has been designated as an easement for Southmoor Subdivision pier slips). . . ." This could mean either that the underlying fee to the forty-foot strip was excepted from the sale or that the underlying fee went to the Lopardos but the strip was designated an easement.

Judge Carlson determined as a conclusion of law that "Godfrey Company is the owner of the underlying fee of the north forty (40) feet of Lot 3 corresponding to that portion covered by the easement dated July 16, 1977." We review a conclusion of law *de novo* without deference to the trial court. *First Nat'l Leasing Corp.,* 81 Wis. 2d at 208, 260 N.W.2d at 253.

In its oral decision at the end of trial, the court stated: "[T]he word, excepting, has very clear legal significance." The court then cited *Traeger v. Traeger,* 35 Wis. 2d 708, 151 N.W.2d 681 (1967), for the proposition that inclusion of the word "except" in a deed means the underlying fee to the land covered by the exception never passes to the new owner. We conclude that the trial court incorrectly interpreted *Traeger.*

■

The trial court relied on a statement in *Traeger* that the part excepted from a deed is held to be something not granted. *Id.* at 712, 151 N.W.2d at 683. However, *Traeger* went on to say that when there is both an exception and a reservation in a deed, whether a particular clause will be considered an exception or a reservation depends not so much on the words used as upon the nature of the right or thing reserved. *Id.* at 712–13, 151 N.W.2d at 683. *Traeger* then held that the disputed deed, which contained a clause with both an exception and a reservation, "merely created an easement in the grantors." *Id.* at 713, 151 N.W.2d at 683. Contrary to the conclusion of the trial court in the instant case, the *Traeger* holding means that Godfrey retained only an easement over the Lopardos' lot and did not retain the underlying fee to the forty-foot strip.

Moreover, the trial court and both parties overlooked precedent where our supreme court established the rule that the exception of an easement conveys the fee to the entire parcel. *Pollnow v. DNR,* 88 Wis. 2d 350, 368, 276 N.W.2d 738, 747 (1979). Quoting a Texas case, the supreme court stated in *Pollnow:*

> An instrument of conveyance which conveys land definitely described in such instrument, and then excepts from such conveyance a road, railroad right of way, canal right of way, etc., as such, occupying a mere easement on, over, or across the land conveyed, conveys the fee to the entire tract, and the exception only operates to render the conveyance or grant subject to the easement.

*Id.* (quoting *Haines v. McLean,* 276 S.W.2d 777, 782 (Tex. 1955)). Following the rule in *Pollnow,* the Lopardos own the fee to all of Lot 3, subject to an easement over the north forty feet of the lot. Therefore, we reverse the trial court's award of the fee to Godfrey.

This brings us to the riparian rights issue. We first consider whether Godfrey has a right to maintain a pier at all, since it is only an easement holder. Then we consider whether the pier may remain where it is presently placed, since it apparently interferes with the Lopardos' riparian rights. These present questions of law which we review *de novo. First Nat'l Leasing Corp.,* 81 Wis. 2d at 208, 260 N.W.2d at 253.

When Godfrey built the pier, it was the owner of Lot 3, including the forty-foot strip covered by the easement. As the owner, Godfrey had full riparian rights to Lot 3. One of those riparian rights is the right to build a pier. However, when Godfrey sold Lot 3 to the Lopardos

in 1985, Godfrey lost its riparian rights to maintain a pier because, at the time, easement holders did not have riparian rights. *See Cassidy,* 132 Wis. 2d at 161, 390 N.W.2d at 85; *de Nava,* 140 Wis. 2d at 215, 409 N.W.2d at 152.

■

Thus, the Lopardos would have had full riparian rights to Lot 3, including the right to remove the pier, if there had been no change in the law of riparian rights. However, in 1989 the legislature enacted sec. 30.131, Stats., which allows a person other than a riparian owner to maintain a wharf or a pier off an easement that was recorded prior to December 31, 1986, provided certain conditions are met. Section 30.131 states:

> **Wharves and piers placed and maintained by persons other than riparian owners.** A wharf or pier of the type which does not require a permit under ss. 30.12(1) and 30.13 that abuts riparian land and that is placed in a navigable water by a person other than the owner of the riparian land may not be considered to be an unlawful structure on the grounds that it is not placed and maintained by the owner if all of the following requirements are met:
>
> (1) The owner of the riparian land or the owner's predecessor in interest entered into a written easement that was recorded before December 31, 1986, and that authorizes access to the shore to a person who is not an owner of the riparian land.
>
> (2) The person to whom the easement was granted or that person's successor in interest is the person who places and maintains the wharf or pier.
>
> (3) The placement and maintenance of the wharf or pier is not prohibited by and is not inconsistent with the terms of the written easement.
>
> (4) The wharf or pier has been placed seasonally in the same location at least once every 4 years

since the written easement described in sub. (1) was recorded.

(5)   The wharf or pier is substantially the same size and configuration as it was on April 28, 1990, or during its last placement before April 28, 1990, whichever is later.

(6)   The placement of the wharf or pier complies with the provisions of this chapter, with any rules promulgated under this chapter and with any applicable municipal regulations or ordinances.

In effect, this legislation bifurcates the riparian rights to an easement in certain circumstances. According to sec. 30.131, Stats., the riparian right to maintain a wharf or pier goes to the easement holder, while, according to *Cassidy* and *de Nava,* all other riparian rights remain with the holder of the underlying fee to the easement property.

The first question in applying the statute to the instant case is whether the statute, enacted in 1989, has retroactive effect for the Godfrey pier, since the Godfrey property was sold to the Lopardos in 1985. We conclude that the legislature clearly intended the statute to have retroactive effect, since the legislature provided for a 1986 recording cutoff date in sec. 30.131(1), Stats. Thus, the statute applies to the Godfrey pier, provided the pier meets the other conditions set forth in the statute.

The Godfrey pier clearly complies with subsecs. (1), (3), (4) and (5) of sec. 30.131, Stats. Therefore, we will discuss only subsecs. (2) and (6). According to subsec. (2), the person who places and maintains the pier must be either the person to whom the easement was granted or that person's successor in interest. Here, Godfrey is the "person" who placed and maintained the pier, whereas Southmoor subdivision is the "person" to whom

the easement was granted. However, Godfrey constructed the pier for the sole benefit and use of the easement holders. Moreover, Godfrey's wholly owned subsidiary, Store Equipment, Inc., was the original easement holder, and Store Equipment entered into pier slip agreements with subsequent easement holders and sold them pier slips.[3]

We conclude that the Godfrey pier meets the condition in subsec. (2). We would be interpreting the statute to reach an absurd result if we concluded that for subsec. (2) to apply, Store Equipment or Southmoor subdivision, rather than the parent company of Store Equipment, should have constructed the pier, especially when the parent company constructed the pier expressly for the benefit of the easement holder. Since subsec. (2) permits a pier to be maintained when constructed by an easement holder, it certainly permits a pier to be maintained when it was constructed by the original grantor of the easement and then given to the easement holder.

The other subsection we discuss is (6). This provides that a pier maintained off an easement must comply with all laws relating to the placement and maintenance of piers. The relevant law for purposes of this case is sec. 30.13(1)(b), Stats. This statute provides that a pier must not interfere with the rights of other riparian owners. Section 30.13(1)(b) states:

> A riparian proprietor may construct a wharf or pier in a navigable waterway extending beyond the ordi-

---

[3]We also note that Store Equipment, Inc., and the pier slip owners have joined Godfrey as plaintiffs in this case. Therefore, in discussing Godfrey's rights, we are discussing the rights of the easement holders.

370

nary high-water mark or an established bulkhead line in aid of navigation without obtaining a permit under s. 30.12 if all of the following conditions are met:

. . ..

(b) The wharf or pier does not interfere with the rights of other riparian proprietors.

The Godfrey pier complied with sec. 30.13(1)(b), Stats., when it was constructed because Godfrey owned all of Lot 3, including all riparian rights. The pier's placement did not interfere with any other existing property owner's riparian rights and certainly not with Godfrey's own riparian rights to the rest of Lot 3. When the Lopardos became the owners of Lot 3, they gained Godfrey's riparian rights to all of Lot 3. After the legislature passed sec. 30.131, Stats., the Lopardos lost their riparian rights to maintain a pier off the easement section of their property, since a pier had been built there by the easement holders of record before 1986 and the pier met the other conditions set forth in sec. 30.131. However, the enactment of sec. 30.131 did not take away the Lopardos' riparian rights to the rest of Lot 3. It is when the Lopardos sought to exercise those riparian rights that this lawsuit began.

After surveying their lot, the Lopardos discovered that the Godfrey pier apparently encroached the riparian rights of the remainder of Lot 3. If the DNR determines at a formal hearing that the pier's placement actually violates the riparian rights of the rest of Lot 3, the Godfrey pier can no longer be said to comply with sec. 30.13(1)(b), Stats. Therefore, it cannot meet the final condition established by the legislature in subsec. (6) of sec. 30.131, Stats., for permitting a pier off an easement.

We conclude that this potential failure to fully comply with subsec. (6) would be fatal only for the current placement of the Godfrey pier but not for the statutory

right to maintain a pier off the easement. The pier can continue to be maintained off the easement because it complied with all laws at the time it was constructed, since it violated no one's riparian rights. However, the placement of the pier will have to be changed if it actually violates the Lopardos' riparian rights. Whether it does violate the Lopardos' riparian rights still has to be determined at the DNR hearing that was put on hold for this lawsuit.

The final question we must consider is whether the Lopardos are estopped from objecting to the pier's apparent violation of their riparian rights since they observed the placement of the pier prior to purchasing Lot 3. The trial court concluded that they were so estopped. Equitable estoppel is a conclusion of law. *See Empire Gen. Life Ins. Co. v. Silverman,* 127 Wis. 2d 270, 283, 379 N.W.2d 853, 859 (Ct. App. 1985), *modified on other grounds,* 135 Wis. 2d 143, 399 N.W.2d 910 (1987). We review this conclusion of law without deference to the trial court. *First Nat'l Leasing Corp.,* 81 Wis. 2d at 208, 260 N.W.2d at 253.

The three elements of equitable estoppel are action or nonaction which induces reliance by another to his or her detriment. *City of Madison v. Lange,* 140 Wis. 2d 1, 6, 408 N.W.2d 763, 765 (Ct. App. 1987). Godfrey's argument is that the Lopardos' failure to complain about the placement of the pier before they purchased Lot 3 induced reliance in Godfrey, causing Godfrey to sell the lot to the Lopardos under the assumption that the pier could remain.

We conclude that the evidence does not support estoppel against the Lopardos. In fact, the opposite

exists. Godfrey failed to inform the Lopardos that the pier's placement potentially interfered with the riparian rights of the remainder of Lot 3. This induced reliance in the Lopardos that they could exercise the normal riparian right of lakefront owners to build a pier to a navigable depth of water.

When Godfrey constructed the pier in 1977, it was advised in writing by a DNR warden that there was a possible problem with the location of the pier. The letter from the warden stated:

> [T]he future owner of Lots 3 and 4, Westmoor Subdivision would have to be apprised of the location of the pier and boat slips as they have riparian rights themselves as the owner of Lots 3 and 4 and might have a possible cause of action against the owner of the pier if the ingress and egress of boats in the pier slips interfered with their respective navigation rights. Obviously, this situation would seem to be solved if they saw the pier's location before they purchased and would quite clearly have no objection if they were allowed to use the boat slips.

Godfrey and the trial court read this letter to say that the problem would be solved if future owners saw the pier's location. We disagree. The complete text of the warden's comment is that the problem would be solved if the future owners raised no objection to the location of the pier after they saw it *and* were apprised that it violated their riparian space.

Further, we note that one asserting an equitable doctrine such as estoppel must have clean hands. *Hendricks v. M.C.I., Inc.*, 152 Wis. 2d 363, 368, 448 N.W.2d 289, 292 (Ct. App. 1989). Godfrey does not have clean hands in this dispute because it did not inform the Lopardos of the potential infringement of their riparian

rights. Moreover, there is no evidence of waiver by the Lopardos. Simply viewing the pier did not put the Lopardos on notice that the pier might be in their riparian space because only a surveyor using one of the possible methods in Wis. Adm. Code sec. **NR 326.07** for extending lot boundaries into a lake would be able to show the possible encroachment. *See Nosek v. Stryker,* 103 Wis. 2d 633, 635–37, 309 N.W.2d 868, 870–72 (Ct. App. 1981).

There is no set rule in Wisconsin for establishing the extension of boundaries into a lake between contiguous shoreline properties. *Id.* at 635, 309 N.W.2d at 870. However, each riparian owner is entitled to exclusive possession to the extent necessary to reach navigable water, to have reasonable ingress and egress to navigable water, and to have reasonable access for bathing and swimming. *Id.* at 640, 309 N.W.2d at 873–74. This rule balances the rights of all lakefront owners and the public to riparian space.

By simply applying the doctrine of equitable estoppel to this dispute, the trial court failed to conduct the necessary balancing of Godfrey's and the Lopardos' riparian rights. It was not a proper exercise of discretion for the trial court to defer to the determination of riparian space that Godfrey had made when it owned all of Lot 3. As the new owner of at least part of Lot 3, the Lopardos had riparian rights which could be knowingly and voluntarily waived only after notice from Godfrey to the Lopardos that the Godfrey pier encroached the riparian space of the remainder of Lot 3. There is no record of notice from Godfrey or waiver from the Lopardos.

We recognize that the trial court did not have the benefit of expert testimony on the various methods of

determining riparian rights because the Lopardos' attorney did not depose DNR officials or subpoena them for trial. However, the record reflects that this failure may have been due to transfers of personnel within the DNR or conflict in scheduling caused by the trial court rather than lack of diligence on the part of the Lopardos' attorney.

Finally, we conclude that the trial court is not the correct decision maker to make the factual determination and allocation of riparian rights. That is the responsibility of the DNR. *See* sec. 30.14(2), Stats. Therefore, we remand this case to the trial court on the riparian rights issue with directions that the trial court remand the case to the DNR.

Costs denied to either party.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded with directions.