Richard J. LOPARDO and Catherine A. Lopardo, Plaintiffs–Appellees and Cross–Appellants,

v.

FLEMING COMPANIES, INC., Godfrey Company, and Store Equipment, Inc., Defendants Third–Party Plaintiffs–Appellants and Cross–Appellees,

v.

CONTINENTAL CASUALTY COMPANY, Intervenor Defendant–Appellee,

and

Liberty Mutual Insurance Company and American Motorists Insurance Company, Third–Party Defendants–Appellees.

Nos. 95–2694, 95–2771.

United States Court of Appeals, Seventh Circuit.

Argued March 27, 1996.

Decided Oct. 3, 1996.

Dennis L. Fisher (argued), Christopher L. Rexroat, Meissner & Tierney, Milwaukee, WI, for Catherine A. Lopardo in both cases.

Christopher L. Rexroat, Meissner & Tierney, Milwaukee, WI, for Richard J. Lopardo in No. 95–2694.

Russell C. Brannen, O'Neil, Cannon & Hollman, Edward A. Hannan, Hugh R. Braun (argued), M. Susan Maloney, Godfrey, Braun & Hayes, Milwaukee, WI, for Godfrey

Co. and Store Equipment, Inc. in No. 95–2694.

Russell C. Brannen, O'Neil, Cannon & Hollman, Edward A. Hannan, M. Susan Maloney, Godfrey Braun & Hayes, Milwaukee, WI, for Fleming Companies, Inc. in No. 95–2694.

Kurt H. Frauen (argued), Bogelt, Powell, Peterson & Frauen, Milwaukee, WI, for Liberty Mutual Ins. Co. in No. 95–2694.

James E. Bors, Rick E. Hills (argued), Hills & Hicks, Brookfield, WI, for American Motorists Ins. Co. in No. 95–2694.

Dennis L. Fisher, Christopher L. Rexroat, Meissner & Tierney, Milwaukee, WI, for Richard J. Lopardo in No. 95–2771.

Russell C. Brannen, O'Neil, Cannon & Hollman, Milwaukee, WI, Hugh R. Braun (argued), Godfrey, Braun & Hayes, Milwaukee, WI, for Fleming Companies, Inc. in No. 95–2771.

Russell C. Brannen, O'Neil, Cannon & Hollman, Milwaukee, WI, Hugh R. Braun, Godfrey, Braun & Hayes, Milwaukee, WI, for Godfrey Co. and Store Equipment, Inc. in No. 95–2771.

Before EASTERBROOK, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

A pier on Middle Lake, Lauderdale Lakes, Wisconsin, provides the backdrop for this decade-long saga between Richard and Catherine Lopardo, on the one hand, and the Godfrey Company and its affiliates, on the other. Our role in this diversity case is to decide whether the district court correctly awarded the relatively modest sum of $54,920 to the Lopardos as compensation for Godfrey's maintenance of a pier that interfered with their riparian rights—a decision that turns exclusively on Wisconsin law of riparian rights, nuisance, trespass, and damages. We must also decide whether the district court correctly dismissed the three insurance company parties, Continental Casualty Company ("Continental"), Liberty Mutual Insurance Company ("Liberty"), and American Motorists Insurance Company ("AMICO"), from the suit. After all is said and done, we conclude that the district court did not clearly err in its findings of fact. Although our analysis of Wisconsin law differs somewhat from that of the district court, in the final analysis the result is the same, and we affirm that court's judgment.

**I**

The story began when James E. Godfrey, the former president of Godfrey Company, decided that he wanted to try his hand at the real estate development business during his retirement years. Godfrey, a Wisconsin corporation with its headquarters in Waukesha, Wisconsin, owns about 100 grocery stores in southeastern Wisconsin. In November of 1987, both Godfrey and its wholly owned subsidiary, Store Equipment, were taken over by Fleming Companies, Inc., an Oklahoma corporation with its headquarters in that state. (Unless the facts require otherwise, we refer to all three—Mr. Godfrey, Godfrey Company, and Store Equipment, as "Godfrey.") In 1976, Godfrey acquired an 800-acre parcel of land in Walworth County, Wisconsin, which had about 400 feet of frontage on Middle Lake in the Lauderdale chain.

Godfrey first subdivided the parcel into a number of subdivisions, only two of which are relevant here: Westmoor and Southmoor. Of those two, only Westmoor had lake frontage. Godfrey then subdivided Westmoor into five lots, four of which were lake front properties, and it subdivided Southmoor into twenty-four lots. To give the future residents of Southmoor access to the lake, Godfrey created a 40-foot easement on the north portion of Westmoor's Lot 3, which was recorded on June 16, 1977. It built an 80-foot pier from the end of the Lot 3 easement, hoping that this would enhance the attractiveness of the Southmoor lots.

After building the initial 80-foot pier, Godfrey decided to expand it by adding an 11-foot "T" section, with six new boat slips. Godfrey submitted the plans for the extension to Robert A. Bramer, a field warden of the Wisconsin Department of Natural Resources (DNR). The plans used the "straight line," or "extended lot lines" method of determining riparian rights, see Wis.

Admn.Code NR § 326.07(2)(c), which involves a simple extension of the onshore property lines into the lake. After a meeting with Godfrey's lawyer and surveyor, Warden Bramer signed a letter addressed to Attorney Rodney Thorson, which said in part:

It is my opinion that the State would have no objection to the eleven-foot addition together with proposed pier slips. The only problem I would foresee would be that a building permit might necessarily have to be acquired from the local township and the future owner of Lots 3 and 4, Westmoor Subdivision would have to be apprised of the location of the pier and boat slips as they have riparian rights themselves as the owner[s] of Lots 3 and 4 and might have a possible cause of action against the owner of the pier if the ingress and egress of boats in the pier slips interferred [sic] with their respective navigation rights. Obviously, this situation would seem to be solved if they saw the pier's location before they purchased and would quite clearly have no objection if they were allowed to use the boat slips.

Sadly enough, nothing turned out to be "obvious" about the extended pier, but Warden Bramer's premonition of trouble was fulfilled beyond anyone's expectations.

With DNR's blessing (as it believed), Godfrey built the approved pier extension, at a time when it still owned both Lot 3 and Lot 4. In 1985, Godfrey Company sold Lot 3 to the Lopardos for $60,000, subject to the recorded easement for Southmoor access to the lake on the north 40 feet. (While the real estate contract mentioned the easement, unfortunately the deed did not, which caused some problems later on.) The Lopardos viewed the lot before they bought it, and they saw the pier in place. No one specifically advised them, however, that the existing pier might violate the riparian zone of the part of Lot 3 that was not subject to the 40–foot easement. In March 1987, the Lopardos began to make preparations to build a home on their lot. They hired Ken Abernathy, a registered land surveyor, to prepare an official survey for them. Because the shoreline of the Westmoor Subdivision is jagged and concave, Abernathy used the co-terminous or "Knitter" method to determine the riparian zone of Lot 3. This method (unlike the straight line method) showed that the Godfrey pier substantially encroached into the Lot 3 riparian zone.

Upset, the Lopardos wrote to Godfrey immediately, informing it that the pier infringed their rights and asking that it be moved. When Godfrey did not respond, the Lopardos asked for help from the DNR. A DNR official examined the pier and agreed with Abernathy both that the co-terminous method was the correct one for this property, and that the pier interfered with the Lopardo's riparian rights. On March 11, 1988, they filed a formal complaint with the DNR. Two months later, another DNR official wrote to Godfrey, strongly recommending that it reconstruct the pier. DNR then scheduled a hearing for August 18, 1988, but that hearing was postponed on a stipulation by the parties to submit the dispute to the Walworth County Circuit Court.

As expected, Godfrey, its associated companies, and a number of the Southmoor owners filed a suit in January 1989, for a declaratory judgment in the Circuit Court of Walworth County. Godfrey claimed error in drafting the 1985 deed to the Lopardos, and it sought reformation of the deed to remove the 40–foot strip altogether from the description of Lot 3, as well as a declaratory judgment on whether the pier infringed Lot 3's riparian rights. The Lopardos counterclaimed on August 28, 1989, seeking a declaration of their sole right as riparian owners to construct a pier on Lot 3, an order requiring Godfrey to remove the existing pier, and "damages in an amount to be determined." After some procedural back-and-forth and a trial before Judge Carlson of the Circuit Court, victory seemed to be within Godfrey's reach. Judge Carlson ordered the 1985 deed reformed to exclude the 40–foot area entirely from Lot 3, declared that Godfrey had riparian rights to use the pier where it was, and decided that the Lopardos were estopped from complaining that it violated their riparian rights.

On appeal, the pendulum swung back to the Lopardos. The Wisconsin Court of Appeals reversed most of Judge Carlson's rul-

ings in *Godfrey Company v. Lopardo,* 164 Wis.2d 352, 474 N.W.2d 786 (App.1991). While the court agreed that the Lopardos' deed had to be reformed, it concluded that Godfrey had not retained a fee interest in the north forty. Instead, the deed was reformed to show the 40–foot easement in favor of the Southmoor owners. With respect to riparian rights, the court first decided that an easement owner like Godfrey could, after the 1989 enactment of Wis. Stat. Ann. § 30.131(1), build a pier from the easement, provided that the six conditions set forth in the statute were satisfied. The court concluded that Godfrey met the first five, but that there was a potential problem with (6), which required that "[t]he placement of the wharf or pier complies with the provisions of this chapter, with any rules promulgated under this chapter and with any applicable municipal regulations or ordinances." Section 30.13(1)(b), Wis. Stat. Ann., provides that a pier must not interfere with the rights of other riparian owners. The court acknowledged that the Godfrey pier, when built, complied with this rule, because Godfrey then owned all of Lot 3. When the Lopardos bought Lot 3, they initially gained all of Godfrey's riparian rights to it, but Godfrey recovered its right to build some kind of pier from the section subject to the easement in 1989, when § 30.131 was passed. The court concluded that the question whether the Godfrey pier actually violated the riparian rights of the unencumbered portion of Lot 3, fell within the primary jurisdiction of the DNR. It also held that the Lopardos were not estopped from objecting to the Godfrey pier, because Godfrey never informed them that its placement might violate their riparian rights, and simply viewing the pier was not enough to put them on notice of a possible violation. Only an expert surveyor would be able to show the possible encroachment. The court therefore remanded the case to the trial court, which in turn remanded it to DNR for a hearing.

Back at DNR four years later, the Lopardos won again. Administrative Law Judge Jeffrey D. Boldt found that the co-terminous riparian rights method of apportionment was the correct one to use, given the physical characteristics of the site. It was undisputed, and he therefore found, that the pier violated the Lopardos' riparian rights under that apportionment system. He also found that Godfrey needed to secure a permit for the pier, under Wis. Stat. Ann. § 30.13(1)(c). Finally, he ordered the pier to be relocated so that it would fit within the riparian rights attached to the 40–foot easement and so that it would comply with a relevant pierhead ordinance restricting it to 35 feet in length. The Circuit Court of Walworth County affirmed his decision on April 2, 1993, and the offending pier was removed in June 1993. Free at last to move ahead with their own plans, the Lopardos built their vacation home, complete with their own two piers for their five boats.

## II

Not willing to let things rest, the Lopardos (Illinois citizens) filed the present diversity action in federal court on February 26, 1993. Their complaint sought damages under three theories: misrepresentation (both intentional and negligent), trespass, and nuisance. At this point, it occurred to Godfrey that its insurance companies should be notified of the pending litigation. Godfrey's risk manager therefore sent a copy of the summons and complaint to Continental on April 9, 1993, and to AMICO on December 17, 1993. He sent a facsimile note to Liberty on March 31, 1993. Continental intervened with a cross-claim against Godfrey for a declaratory judgment, stating that it had no duty to defend Godfrey, and that there was no coverage under its policy, due principally to Godfrey's failure to give it timely notice of the controversy surrounding the pier. Godfrey then filed a third-party complaint against Liberty and AMICO seeking a declaration of a duty to defend and coverage.

In an order of May 16, 1995, the district court granted summary judgment to all three insurance companies. After reviewing the facts we have set forth here, it noted that on November 28, 1989, counsel for Godfrey wrote a letter to a host of people, including a title company, a surveyor, two brokers, and another one of Godfrey's lawyers, warning them about the litigation that was underway before the DNR and the courts, and specifi-

cally noting that "the court could order removal of the existing pier." The letter suggested that the recipients might want to contact their liability carriers or to join in the action. In another letter, one of Godfrey's lawyers warned the Southmoor owners that they might be swept into the litigation (as they eventually were). In spite of these precautions, Godfrey never told its own insurance companies anything about the multifaceted proceedings. The district court, observing that the duty to notify under each of the policies was separate from the duties to defend and to indemnify, held as a matter of law that Godfrey's 1993 notices were too late.

The principal claims went to trial before the court. In his findings of fact and conclusions of law, Judge Curran rejected the Lopardos' misrepresentation theories, finding that Godfrey neither intended to deceive the Lopardos nor was it negligent. Relying, as the Wisconsin courts frequently do, on the Restatement (2d) of Torts, he found that the pier was *not* a "nontrespassory invasion" of the Lopardos' interest in their property, and he accordingly rejected their nuisance theory. See Restatement (2d) of Torts, § 821D. Trespass proved to be the winning card for the Lopardos. The judge concluded that trespass protected the Lopardos against unauthorized invasions of their riparian rights, and because it was undisputed that the Godfrey pier intruded into their riparian space, their claim succeeded. Of the three elements of damages the Lopardos sought, the judge awarded two. First, finding that their decision to delay construction of the house from 1987 until 1993 was justified, he concluded that they were entitled to the $39,560 in increased building costs that had accrued. Second, he awarded an amount representing their lost use of the property, which he calculated based on rental values for similar property. From the Lopardos' evidence that a $400,000 home would rent for $1,500 per week, the judge trimmed the weekly rate down to something comparable to their actual $60,000 investment, or $225 per week, which is $32 per day. He then multiplied the $32 daily rate times four days per week, 20 weeks per year, six years, and came up with $15,360 as a fair approximation of the lost use. He rejected their claim for damages

based on the costs of the Wisconsin court proceedings, pursuant to *Weinhagen v. Hayes*, 179 Wis. 62, 190 N.W. 1002 (1922), on the ground that this was not "collateral litigation." The final judgment for the Lopardos was therefore $54,920.

## III

Godfrey has appealed both the judgment for the Lopardos and the summary judgment for the insurance companies, while the Lopardos have cross-appealed from the court's refusal to award *Weinhagen* damages and its estimate of their lost use damages. We consider first Godfrey's appeal on the insurance issues, next his appeal on liability, and finally the Lopardos' cross-appeal.

### A. The Insurance Claims

We have little to add to the district court's analysis of these claims. All three of the insurance policies at issue required the insured, Godfrey, to give timely notice of an "occurrence" that could lead to a claim. Each made it clear that notice was required before a claim was actually made or a suit brought against the insured. Wisconsin law, of course, governs these policies, and the Wisconsin Supreme Court has held that "the purpose of the requirement that an insurer be given timely notice is to afford the liability carrier an opportunity to investigate possible claims against the policy or its insured while the witnesses are available and their memories are fresh." *Gerrard Realty Corp. v. American States Insurance Co.*, 89 Wis.2d 130, 277 N.W.2d 863, 869 (1979), citing *Kolbeck v. Rural Mutual Insurance Co.*, 70 Wis.2d 655, 235 N.W.2d 466, 469 (1975). Wisconsin has legislated on the specific question of when notice is timely:

> Provided notice or proof of loss is furnished as soon as reasonably possible and within one year after the time it was required by the policy, failure to furnish such notice or proof within the time required by the policy does not invalidate or reduce a claim unless the insurer is prejudiced thereby and it was reasonably possible to meet the time limit.

Wis. Stat. Ann. § 631.81(1). The statute is an additional provision of the insurance contract that is incorporated into the contract of insurance by operation of law. See *Garcia v. Regent Insurance Co.*, 167 Wis.2d 287, 481 N.W.2d 660, 667 (Wis.Ct.App.1992).

Godfrey argues that the 1993 notices to the three companies were timely because the federal court action was the first one in which it faced a risk of paying damages. It concedes that the Lopardos asked for damages in the Walworth County Court, but it argues that damages cannot be awarded in a declaratory judgment action and thus that their request could not affect its duty to notify. Furthermore, it asserts that the insurers were not prejudiced by the four-year delay in notification, because nothing had changed in the interim.

These arguments miss the mark. The duty to notify is triggered by an occurrence, not by the insured's unilateral determination that a potentially successful suit for damages is underway. This case, through all its stages, has been about the Godfrey pier. Probably by the time the Lopardos filed their formal administrative complaint with the DNR on March 11, 1988, and certainly by the time Godfrey filed the January 1989 suit for a declaratory judgment, an "occurrence" within the meaning of the policies had occurred. Godfrey's lawyers recognized this, in part, when they sent the November 1989 letters to others concerned with the dispute. Godfrey argues that it was not an "occurrence" principally because the Walworth County Circuit Court (it asserts) could not have awarded money damages to the Lopardos. Again, that is beside the point. Certainly if the Lopardos' demand for damages could have been entertained by the Walworth County Circuit Court, there is no question about the breach of the duty to notify. But even if this was unclear under Wisconsin law, or if that court clearly could not award damages, that does not make the litigation a nullity. Issue preclusion might have attached to the court's findings about the riparian rights enjoyed by the Lopardos, which might have played a significant role in further litigation where damages were recoverable. The insurance companies might have been able to participate in a more amicable resolution of the dispute, thereby avoiding some of the many years of litigation that have ensued. We conclude that an "occurrence" within the meaning of each of the insurance policies at issue here had occurred no later than August 1989, when the counterclaim was filed. It is not necessary to pin down the exact date any further for present purposes.

■ Under § 631.81, Godfrey had one year after that time in which to notify his insurers. Because it did not, the burden of nonpersuasion shifted to it to show that the insurers were not prejudiced by the delay. *Gerrard Realty*, 277 N.W.2d at 872; *Rentmeester v. Wisconsin Lawyers Mutual Insurance Co.*, 164 Wis.2d 1, 473 N.W.2d 160, 164 (Wis.Ct.App.1991). We agree again with Judge Curran that it cannot do so. Godfrey lost on appeal in the Wisconsin courts, and the determination of riparian rights was adverse to the defendants on remand before the DNR. The insurance companies cannot recover the lost opportunity to participate or monitor these proceedings, and Godfrey cannot deny that they have an effect on the present case. (We are somewhat surprised that the Lopardos did not plead offensive collateral estoppel based on the earlier proceedings, because the elements of that doctrine appear to be satisfied. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979); *Cohen v. Bucci*, 905 F.2d 1111, 1112–13 (7th Cir.1990). Even without issue preclusion, however, the decisions of the Wisconsin tribunals on this very matter are entitled to substantial deference in our Court.) In addition to the legal ramifications of Godfrey's failure to notify its insurers of the state litigation, there are also the familiar factual elements of prejudice caused by passage of time. Four years, as the district court observed, is a rather long time to wait. Wisconsin, as noted above, places the burden of nonpersuasion on the party who failed to give notice, under § 631.81. The circumstances here admit of only one result: Godfrey waited too long, and the insurance companies were entitled to summary judgment dismissing them from the suit.

## B. Liability for the Pier

■ With respect to the liability issues, Godfrey offers only one principal argument on appeal. It asserts that because the DNR approved the placement of the pier in 1977, through Warden Bramer's letter, maintenance of the pier cannot be considered a trespass on the Lopardos' riparian rights until that 1977 authorization was rescinded. Rescission, it argues, occurred only at the conclusion of the DNR hearing on remand from the Wisconsin Court of Appeals in 1993. In addition, it asserts, without offering any authority, that the invasion of riparian rights of an adjoining property owner does not constitute trespass. We consider both these arguments, as well as the district court's legal conclusion that a claim for nuisance was inappropriate because the pier physically encroached on the area subject to the Lopardos' riparian rights.

The Wisconsin Court of Appeals considered the effect of Warden Bramer's letter in its opinion, in the context of deciding whether the Lopardos were estopped from complaining about the placement of the pier. We find its comments pertinent to the slightly different argument presented here, that the letter amounted to a license to place the pier where it was that was not revoked until 1993. In its opinion, the Wisconsin court did not read the letter this way. Instead, the court noted that the warden alerted Godfrey to a possible problem with the location of the pier and he opined that the problem would be solved if the future owners saw the pier before they bought and were apprised that it violated their riparian space. 164 Wis.2d at 373, 474 N.W.2d at 794. In other words, the letter indicated that the State of Wisconsin had no objection to the location, but that it was not purporting to override the riparian rights of other property owners or to speak for those owners. The court found that the Lopardos were not adequately apprised that the pier violated their riparian space, because only a trained surveyor would be able to detect an encroachment. The district court in the present case took note of that interpretation in its own findings of fact, para. 11.

The only kind of license that would have made any difference here is one that would take precedence over private riparian rights. If the alleged license were subordinate to private rights, Godfrey gets no help from arguing that it exists. Yet, assuming for the sake of argument that Warden Bramer was authorized to speak for DNR on the subject of pier locations and that he exercised that authority in his letter, a fair reading of the letter leads to only one conclusion: the State's permission, while necessary for the pier, was not enough to displace private riparian rights. Indeed, the Warden said exactly that: "the future owner[s] of Lot[ ] 3 ... have riparian rights themselves ... and might have a possible cause of action against the owner of the pier...." This is not language a state official would use if the letter were designed to supersede any such private claims. We therefore conclude that the original letter from DNR did not assure that the pier was rightfully placed for purposes of conflicting private rights.

■ With respect to the private action, the district court appeared to believe that only a trespass claim would lie, because the invasion involved a physical encroachment on the land. We review this legal conclusion de novo, bearing in mind that we are entitled to affirm the district court on any basis that fairly appears in the record. See, e.g., Door Systems, Inc. v. Pro–Line Door Systems, Inc., 83 F.3d 169, 173–74 (7th Cir.1996); Loewen Group Int'l v. Haberichter, 65 F.3d 1417, 1425 (7th Cir.1995); Johnson v. Gudmundsson, 35 F.3d 1104, 1115 (7th Cir.1994).

In similar situations, the Wisconsin Supreme Court has turned to the Restatement (2d) of Torts for guidance. See, e.g., Crest Chevrolet–Oldsmobile–Cadillac, Inc. v. Willemsen, 129 Wis.2d 129, 384 N.W.2d 692 (1986); Krueger v. Mitchell, 112 Wis.2d 88, 332 N.W.2d 733 (1983). Because, as the parties implicitly concede, there is no case directly on point in either the Wisconsin Supreme Court or in the courts of appeals, we turn initially to the Restatement for guidance on the distinction between the law of trespass and the law of nuisance. Comment d to § 821D offers a succinct description of two types of claims: "A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it. (See §§ 157–166.)

A nuisance is an interference with the interest in the private use and enjoyment of the land, and does not require interference with the possession." See also *Vogel v. Grant–Lafayette Electric Cooperative*, 548 N.W.2d 829, 832–33 (Wis.1996) (relying on the Restatement (2d) of Torts for its definition of nuisance); *Wisconsin Power & Light Co. v. Columbia County*, 18 Wis.2d 39, 117 N.W.2d 597, 600 (1962) (relying on the Restatement (1st) of Torts definition of trespass). For trespass, there is no need to show the unreasonableness of the interference, but the opposite is true for nuisance.

Trespass and nuisance are not, however, mutually exclusive remedies; to the contrary, Comment e to § 821D notes that they overlap on occasion. Pertinently for the Lopardos' case, it states that "[i]f the interference with the use and enjoyment of the land is a significant one, sufficient in itself to amount to a private nuisance, the fact that it arises out of or is accompanied by a trespass will not prevent recovery for the nuisance, and the action may be maintained upon either basis as the plaintiff elects or both."

Invasions of riparian rights under the Restatement are treated more like a nuisance than like trespass, notwithstanding the fact that they have their own section of the Restatement. The discussion appears in Division Ten, which treats "invasions of interests in land other than by trespass" (and also includes nuisance), under the specific category of "interference with the use of water." See Restatement (2d) of Torts, §§ 841–64. Section 850 provides that "[a] riparian proprietor is subject to liability for making an unreasonable use of the water of a watercourse or lake that causes harm to another riparian proprietor's reasonable use of water or his land." Recreational uses are explicitly recognized by the Restatement as among the more important modern uses of water. See Introductory Note to Chapter 41, at 181. Section 850A offers a nonexclusive list of nine factors that bear upon the reasonableness of a use of water, including the purpose of the use, its social and economic value, the ease of avoiding harm to the other riparian owner, and the equities of the situation. Because these considerations are so similar to the law

of nuisance, we believe that Wisconsin nuisance law gives the best guidance on how this case should be approached.

The Wisconsin Court of Appeals was faced with a situation quite similar to ours in *Nosek v. Stryker*, 103 Wis.2d 633, 309 N.W.2d 868 (Wis.Ct.App.1981). Two neighboring riparian owners each claimed that the other's pier encroached upon his waterfront rights. The trial court had found that Nosek's pier interfered with Stryker's riparian rights and was therefore a private nuisance to Stryker; it ordered the pier moved some distance away. The Wisconsin Court of Appeals affirmed. After discussing the different ways of determining riparian rights, the court found that the "method to be followed depends upon the particular circumstances" of the shoreline and the adjacent properties. *Id.*, 309 N.W.2d at 873. It held that "[e]ach riparian owner is ... entitled to exclusive possession to the extent necessary to reach navigable water, to have reasonable ingress and egress to navigable water and to have reasonable access for bathing and swimming." *Id.*, 309 N.W.2d at 873–74. Each riparian owner's zone of exclusive use of the apportioned riparian tract is measured by the shoreline, the extended boundary lines (drawn by the most appropriate method), and the line of navigability. Finally, the court noted that Wis. Stat. Ann. § 30.13(1) confers the right to build a pier without a permit only if it does not interfere with the rights of other riparian proprietors. In the event of an unreasonable interference with riparian rights, however, abatement of the nuisance was "a" proper means of restraint (although, as we shall see, not the only remedy recognized under Wisconsin law for a nuisance). *Id.*, 309 N.W.2d at 875.

Applying these general standards, we conclude that the facts found by the district court support a conclusion that the Godfrey pier unlawfully interfered with the Lopardos' riparian rights, either as a private nuisance or as an unreasonable use of the lake water. First, as noted above, the fact that the Godfrey pier encroached into the Lopardos' riparian space does not preclude the use of a nuisance theory, as both the Restatement and *Nosek* demonstrate. Second, the fact

that the DNR authoritatively determined that Godfrey had no right to use the water in the Lopardos' riparian zone at all for the purpose of a pier shows that Godfrey's use was an unreasonable one. (This is not an instance where Godfrey might have been overfishing entirely within its riparian space, or diverting too much water for home or agricultural use, or taking other actions that might require factual development to see if the degree of use was unreasonable. The invasory nature of Godfrey's use makes it unnecessary to weigh such questions of degree.) Furthermore, the district court found as a fact that Godfrey had displayed "intransigence" in maintaining its pier in the riparian zone of Lot 3. This injured the Lopardos, who (the district court found) reasonably waited to begin construction of their house until the dispute was finally resolved. The pier was a private nuisance, and the Lopardos were entitled to a remedy.

■ We do not mean to imply by the foregoing discussion that we believe the Supreme Court of Wisconsin would reject trespass as a basis for recovery; quite to the contrary, because the Restatement recognizes that a plaintiff may have an election of theories, that court might well agree with Judge Curran that Godfrey also trespassed upon the Lopardos' riparian rights. It is clear that riparian rights are a species of property right, see *Wisconsin v. Bleck,* 114 Wis.2d 454, 338 N.W.2d 492, 498 (1983); Robert E. Beck, 1 Waters and Water Rights § 6.01(a)(2) at 101 (1991), and that, like land, there is a particular area over which they can be exercised. Even though not all interferences with riparian rights will involve a physical invasion, the Supreme Court of Wisconsin might conclude that the subset that do involve such an invasion give rise to a claim in trespass. Compare *Roughton v. Thiele Kaolin Co.,* 209 Ga. 577, 74 S.E.2d 844 (1953) (theories of trespass and nuisance both used where upper riparian owner polluted water of nonnavigable stream, impairing owner's use); *Difronzo v. Village of Port Sanilac,* 166 Mich.App. 148, 419 N.W.2d 756 (1988) (law of Michigan provides that governmental interference with riparian rights can constitute a taking); *Zagaroli v. Pollock,* 94 N.C.App. 46, 379 S.E.2d 653 (1989) (trespass proven, based

in part on title to bottom of lake). We rely on nuisance analogies only because the courts of Wisconsin have given us more guidance on this theory, and it is not our role to break new ground in state law.

## C. Damages Cross–Appeal

■ Although abatement is the classic remedy for a private nuisance, Wisconsin allows plaintiffs to recover monetary damages as well. See, *e.g., Crest Chevrolet–Oldsmobile–Cadillac, Inc., supra,* 384 N.W.2d at 693; *Krueger v. Mitchell, supra,* 332 N.W.2d at 742 (permitting, in an aviation noise case, recovery of damages but refusing to allow an injunction due to federal preemption concerns); *Barbian v. Lindner Bros. Trucking Co.,* 106 Wis.2d 291, 316 N.W.2d 371, 377 (1982). The only remaining issue is therefore the Lopardos' cross-appeal, which claims that the district court committed an error of law in deciding what types of damages were compensable, and that it clearly erred in its calculation of the damages.

The Lopardos argue that the court erred in two respects: its ruling rejecting attorneys' fees relating to the state court litigation as damages arising from third party litigation, and its method for determining damages for the loss of use of their property. They concede, with respect to the second point, that appellate courts normally apply a clearly erroneous standard in reviewing a district court's determination of damages, see *Wyletal v. United States,* 907 F.2d 49, 51 (7th Cir.1990); *Busche v. Burkee,* 649 F.2d 509, 518 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), but they assert that the problem here was in the formula that the court used, which they characterize as an issue of law reviewable *de novo.*

In *Weinhagen v. Hayes, supra,* the Supreme Court of Wisconsin held that "where the wrongful acts of the defendant [have] involved the plaintiff in litigation *with others,* or placed him in such relation *with others* as to make it necessary to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act." 190 N.W. at

1003, citing *McGaw v. Acker, Merrall & Condit Co.*, 111 Md. 153, 73 A. 731 (1909) (emphasis added). The original wrongful act here, the Lopardos assert, was Godfrey's placement of the pier. They argue that Godfrey was not really involved in the state court proceedings, because Godfrey was just the middleman between the Lopardos and the Southmoor owners. Finally, the Lopardos believe it is significant that Godfrey did not join the Southmoor owners' appeal from Administrative Law Judge Boldt's 1992 decision.

In our view, the district court correctly concluded that *Weinhagen* damages are available only when the defendant's wrongful act involves one in litigation with a stranger to the current lawsuit. Whatever else the Godfrey Company and the other defendants here may be, they are no strangers to this litigation about the pier. They were involved every step of the way through the Wisconsin proceedings. To the extent Wisconsin law permits recovery of costs and attorneys' fees after a successful court proceeding or administrative proceeding, the Lopardos were free to petition for these items. To the extent that Wisconsin law restricts such awards, it reflects the policy of the state with respect to litigation incentives and fee-shifting—a balance we should not disturb in a diversity case. Indeed, as we noted above, it is somewhat surprising that no one has challenged the possibility of this kind of followon litigation. Perhaps Godfrey's need to keep the two proceedings separate for purposes of the insurance appeal has driven its litigation strategy here; perhaps jurisdictional restrictions in the Wisconsin courts are so strict that they could not have entertained this action and there would be no merit to a *res judicata* defense. No matter for us; it is waivable and not before this court. This is not, however, the kind of situation for which *Weinhagen* damages are available.

■ We also disagree with the Lopardos' effort to transform the district court's finding of the amount of damages for loss of use of their property into a question of law. Loss of use is a recoverable item of damages in a case charging harm to land from an invasion, see Restatement (2d) of Torts § 929(1)(b),

and the Wisconsin courts have used this as a measure of damages in nuisance cases. See *Andersen v. Village of Little Chute*, 549 N.W.2d 737, 742–43 (Wis.Ct.App.1996). The judge used reasonable rental value as a measure of loss of the use and enjoyment of the property, which is also appropriate as a matter of law. The Lopardos' only dispute is with the actual figures the judge plugged into his formula, but these are factual questions that we review deferentially. While the method was somewhat rough, the judge's decision to make his estimate based upon a $60,000 investment (the actual amount of the Lopardos' investment in the unimproved property) rather than a $400,000 investment (the amount they claimed a house comparable to the one they wanted would cost) was not unreasonable. The judge noted, for example, that the $400,000 figure was for 1994, yet the damages period ran from 1987 through 1993. But the Lopardos were not planning on building a home that would have cost $400,000 in 1994; they planned on a home costing $172,000 in 1987 (or $211,560 in 1993). Nothing gets built instantaneously, and thus there would have been some delay—perhaps as much as a season, even if there had been no pier to worry about in 1987. The judge was correct to attempt to adjust for the speculative nature of the proof the Lopardos offered; they cannot complain now that he had nothing more precise before him. In fact, he gave them the benefit of the doubt on the number of days per year they would have used the property. We do not, in short, have a definite and firm conviction that the district court judge's estimate was outside the wide bounds of his discretion in calculating damages.

The judgment of the district court is Affirmed in all respects.